PEOPLE v WESLEY
PEOPLE v TAORMINA
PEOPLE v GERALD PHILLIPS
PEOPLE v PHILLIP PHILLIPS
PEOPLE v THREET
PEOPLE v DOPP

Docket Nos. 66597, 67161, 67162, 69160, 69195, 69196, 69532, 69533. Argued May 4, 1983 (Calendar Nos. 15-19).—Decided December 28, 1984. Released February 1, 1985. Rehearings denied in *Gerald Phillips, Phillip Phillips,* and *Threet, post,* 1202.

Joe F. Wesley, Jr., was convicted by a jury in the Genesee Circuit Court, Harry P. Newblatt, J., of kidnapping and first-degree felony murder. The Court of Appeals, M. F. Cavanagh, P.J., and Beasley, J. (M. J. Kelly, J., concurring), affirmed, but remanded for vacation of the kidnapping conviction on the ground that it was a necessary element of the murder conviction (Docket No. 47368). The defendant appeals, asserting that the trial court's instructions on the elements of kidnapping were insufficient and that without the kidnapping, there could be no felony murder.

Samuel Taormina, Gerald Phillips, and Phillip Phillips were convicted by a jury in the Ottawa Circuit Court, Calvin L. Bosman, J., of kidnapping. The Court of Appeals, D. E. Holbrook, Jr., P.J., and V. J. Brennan and Hotchkiss, JJ., affirmed in an unpublished opinion per curiam in *Taormina* (Docket Nos. 77-4396, 77-4397), and R. B. Burns, P.J., and Allen and Gillespie, JJ., affirmed in *Gerald Phillips* and *Phillip Phillips* (Docket Nos. 77-5164, 51572). The defendants appeal, claiming

---

REFERENCES FOR POINTS IN HEADNOTES
[1-3, 5-7] 1 Am Jur 2d, Abduction and Kidnapping §§ 11, 21, 30.
[2] 1 Am Jur 2d, Abduction and Kidnapping § 12.
[4, 6, 7] 1 Am Jur 2d, Abduction and Kidnapping § 32.
    75 Am Jur 2d, Trial § 719.
[6, 7] 1 Am Jur 2d, Abduction and Kidnapping § 20.
[8] 1 Am Jur 2d, Abduction and Kidnapping § 9.
    Seizure or detention for purpose of committing rape, robbery, or similar offense as constituting separate crime of kidnapping. 43 ALR3d 699.

that the instructions to the jury on kidnapping were insufficient.

James Threet and Keith D. Dopp were convicted by a jury in the Lenawee Circuit Court, Kenneth B. Glaser, Jr., J., of kidnapping, assault with intent to commit murder, and possession of a firearm during the commission of a felony. The Court of Appeals, M. F. Cavanagh, P.J., and Bronson and Beasley, JJ., reversed the kidnapping convictions in an unpublished opinion per curiam, holding that an instruction that the confinement of the victim with the intent to murder was sufficient to convict the defendants of kidnapping was error (Docket Nos. 54352, 55305). The people appeal and the defendants cross-appeal.

In an opinion by Justice Boyle, joined by Chief Justice Williams and Justices Ryan and Brickley, the Supreme Court *held:*

A person can be convicted of kidnapping if it is proven beyond a reasonable doubt that the person wilfully, maliciously, and without lawful authority, forcibly or secretly confined or imprisoned any other person within this state against his will, or forcibly carried or sent a person out of this state, or forcibly seized or confined, or inveigled or kidnapped any other person with intent to extort money or other valuable thing thereby or with intent to either cause the person to be secretly confined or imprisoned in this state against his will, or to cause the person to be in any way held to service against his will.

1. It is completely appropriate to hold that any movement incidental to a crime involving murder, extortion, or taking a hostage is sufficient for kidnapping because such conduct does not present the danger of overcharging. Where forcible confinement kidnapping is charged there must be evidence of a forcible confinement of another person within the state, done wilfully, maliciously and without lawful authority, against the will of the person confined or imprisoned, and an asportation of the victim which is not merely incidental to an underlying crime unless the crime involves murder, extortion, or taking a hostage. Asportation incidental to these types of crimes is sufficient asportation for a kidnapping conviction. No movement is required, however, where the victim was secretly confined. Historical, common-law kidnapping is complete upon the forcible asportation of a victim across the state boundary.

2. A person may be convicted of kidnapping for wilfully, maliciously, and without lawful authority forcibly seizing or confining or inveigling or kidnapping another person with an intent to extort money or other valuable thing or with an intent either to cause the person to be secretly confined or

imprisoned within the state against his will or to cause the person to be in any way held to service against his will. Because these forms of kidnapping do not involve the dangers of inappropriate punishment or overcharging, there is no reason to interpolate asportation as an element when a person is so charged. Asportation is required as an element of kidnapping only where a person is charged with forcible confinement.

3. Each of these cases must be examined in light of the six separate variations of conduct enumerated in the statute to assess the accuracy of the instruction of the juries. In each case, the parties proceeded on a theory of false imprisonment kidnapping. Therefore, the jury instructions in each case must be examined to determine if they fairly and accurately apprised the jury of the elements of false imprisonment kidnapping by forcible confinement. In *Wesley,* the jury was adequately instructed on all of the elements of the crime and on the element of asportation. In *Taormina, Gerald Phillips,* and *Phillip Phillips,* the jury was correctly informed of the elements of false imprisonment kidnapping. In *Threet* and *Dopp,* the jury was correctly instructed on what was required for conviction, and their convictions must be reinstated.

*Wesley, Taormina, Gerald Phillips,* and *Phillip Phillips,* affirmed.

*Threet* and *Dopp,* reversed.

Justice Levin, joined by Justice Cavanagh, dissenting, stated that the practical construction of the term "forcible confinement" in the kidnapping statute for over 125 years was that it did not include a bodily restraint or movement of a victim incidental to the commission of a separately punishable offense involving a bodily assault. The Legislature intended to proscribe as kidnapping a forcible detention or movement of a person with the intent to extort or bring about secret confinement or involuntary service, or to terrorize the victim or someone else, without intent physically to assault or rob the victim.

The structure and definitional language of the kidnapping statute have remained intact even though the maximum punishment for kidnapping has been increased and commission of kidnapping is now a factor that aggravates the punishment for second-degree murder and third-degree criminal sexual conduct. The conduct proscribed by the kidnapping statute may be identified only with reference to the intent of the Legislature when the "forcible confinement" formulation was first enacted.

If the felonious intent of the actor at the time the victim is forcibly detained or moved includes commission of another

physically assaultive offense, the detention or movement is not a "forcible confinement" within the meaning of the kidnapping statute. If the actor has the felonious intent to extort money or to hold the victim as a hostage for some purpose other than assault at the time the victim is forcibly detained or moved, or to terrorize the victim or someone else, but does not intend physically to assault the victim or steal money or other property from him, the actor is guilty of kidnapping and continues to be guilty of committing that offense if, after so detaining or moving the victim, an additional felonious intent is formed and acted upon by committing another physically assaultive offense on the previously detained victim. Where there is evidence that supports a finding that at the time of the detention or movement of the victim the actor had a felonious intent other than to rob, rape, murder or otherwise physically assault the victim, but there is also evidence from which the jury could infer an intent to so assault the victim, the jury should be instructed that it cannot convict the defendant of both kidnapping and such other assaultive offense unless it finds that the intent to commit the other assaultive offense was formed after the forcible detention or movement of the victim.

The majority errs fundamentally in stating, in effect, that incidental, forcible movement of a victim constitutes kidnapping where the underlying offense is murder rather than rape, robbery, or some other bodily assault. It finds it "completely appropriate to hold that movement incidental to a crime involving murder . . . is sufficient for kidnapping because such conduct does not present the danger of overcharging," without offering any explanation or support for its assertion. Under this construction, *any* murder involving an incidental movement of the victim is first-degree murder although there is no evidence of premeditation and deliberation or perpetration or attempted perpetration of a statutorily enumerated felony or of a kidnapping involving either secret confinement or forcible confinement not incidental to the murder. In adding kidnapping as an enumerated felony under the felony-murder statute, the Legislature did not intend to dispense with the need to prove premeditation and deliberation whenever there is an incidental, forcible movement of the victim. Rather, the addition of kidnapping as an enumerated felony was designed to deter and punish the kidnapper who, following a seizure for ransom or the taking of a hostage, considers murdering the victim. The redefinition of kidnapping offered by the majority will inappropriately facilitate prosecution and conviction by extracting guilty pleas to second-degree murder and third-degree criminal

sexual conduct where the evidence shows that movement of the victim was incidental to the commission of such physically assaultive offense.

Justice Kavanagh, dissenting, stated that: for a conviction of kidnapping, it must be determined that the accused committed specific acts enumerated in the kidnapping statute to accomplish certain purposes, namely, to extort something valuable, or to secretly confine or imprison a person in this state against his will, or to hold a person to service against his will. The confinement or holding must be the ultimate purpose behind the course of conduct, rather than an incident of some other offense, such as robbery or rape, which may invoke some confinement for completion. Where the conduct is committed without one of these purposes or for some purpose not included in the statute, the actor does not violate the kidnapping statute.

1. In *Wesley,* the jury was not instructed that for a conviction of kidnapping the defendant must have acted with the specific intent to accomplish one of the purposes enumerated in the kidnapping statute. The evidence tends to show that the defendant intended to commit criminal sexual conduct, a purpose not enumerated in the kidnapping statute, and reversal of the kidnapping conviction is required. Because kidnapping was the felony underlying the defendant's conviction of first-degree murder, reversal of the conviction of kidnapping removes an element necessary for conviction of first-degree felony murder. Therefore, the defendant's conviction must be reduced to second-degree murder and the case remanded for resentencing, or for a retrial for felony murder at the option of the prosecutor.

2. In *Taormina, Gerald Phillips,* and *Phillip Phillips,* the trial court instructed the jury that to convict the defendants of kidnapping it was necessary that they determine that the defendants intended to kidnap, which was insufficient to guide the jury's deliberations. An intent to kidnap is an intent to accomplish one of the purposes enumerated in the statute. An act proscribed by the statute must have been committed with the intent to extort money or another valuable thing, to cause a person to be secretly confined in the state against his will, or to hold a person to service against his will. Because the trial court failed to explain the element of specific intent, the convictions of kidnapping must be reversed and the case remanded for a new trial.

3. In *Threet* and *Dopp,* the instruction to the jury that confinement of the victim committed with the intent to murder was sufficient to convict the defendants of kidnapping was not

correct. The kidnapping statute does not include murder as one of the intents specified.

103 Mich App 240; 303 NW2d 194 (1981) affirmed.

112 Mich App 98; 315 NW2d 868 (1982) affirmed.

OPINION OF THE COURT

1. KIDNAPPING — STATUTES — CONSTRUCTION.

A person can be convicted of kidnapping if it is proven beyond a reasonable doubt that the person wilfully, maliciously, and without lawful authority, forcibly or secretly confined or imprisoned any other person within this state against his will, or forcibly carried or sent a person out of this state, or forcibly seized or confined, or inveigled or kidnapped any other person with intent to extort money or other valuable thing thereby or with intent to either cause the person to be secretly confined or imprisoned in this state against his will, or to cause the person to be in any way held to service against his will (MCL 750.349; MSA 28.581).

2. KIDNAPPING — STATUTES — CONSTRUCTION — ASPORTATION.

Any movement incidental to a crime involving murder, extortion, or taking a hostage is sufficient for kidnapping because such conduct does not present the danger of overcharging; where forcible confinement kidnapping is charged there must be evidence of a forcible confinement of another person within the state, done wilfully, maliciously, and without lawful authority, against the will of the person confined or imprisoned, and an asportation of the victim which is not merely incidental to an underlying crime; no movement is required, however, where the victim was secretly confined (MCL 750.349; MSA 28.581).

DISSENTING OPINION BY LEVIN, J.

3. KIDNAPPING — STATUTES — CONSTRUCTION.

*A forcible detention or movement of a person with the intent to extort or bring about secret confinement or involuntary service, or to terrorize the victim or someone else, without intent physically to assault or rob the victim is kidnapping; if, after so detaining or moving the victim, an additional felonious intent is formed and acted upon by committing a physically assaultive offense on the victim, the actor continues to be guilty of kidnapping and the additional offense; however, if the felonious intent of the actor at the time the victim is forcibly detained or moved includes commission of another physically assaultive offense, the detention or movement is not a forcible confinement within the meaning of the kidnapping statute (MCL 750.349; MSA 28.581).*

4. KIDNAPPING — JURY INSTRUCTIONS.

*Where there is evidence that supports a finding that at the time of the detention or movement of a victim the actor had a felonious intent other than to rob, rape, murder, or otherwise physically assault the victim, but there is also evidence from which the jury could infer an intent to so assault the victim, the jury should be instructed that it cannot convict the defendant of both kidnapping and such other assaultive offense unless it finds that the intent to commit the other assaultive offense was formed after the forcible detention or movement of the victim (MCL 750.349; MSA 28.581).*

DISSENTING OPINION BY KAVANAGH, J.

5. KIDNAPPING — STATUTES — CONSTRUCTION.

*For a conviction of kidnapping, it must be determined that the accused committed specific acts enumerated in the kidnapping statute to accomplish certain purposes, namely, to extort something valuable, or to secretly confine or imprison a person in this state against his will, or to hold a person to service against his will; where the act is committed for some purpose not proscribed by the statute, the actor does not violate the kidnapping statute (MCL 750.349; MSA 28.581).*

6. KIDNAPPING — JURY INSTRUCTIONS — CRIMINAL SEXUAL CONDUCT.

*An instruction to the jury which did not state that the defendant must have acted with a specific intent required by the kidnapping statute to accomplish one of the purposes enumerated in the statute, where the evidence tended to show that the defendant intended to commit criminal sexual conduct, a purpose not enumerated, was insufficient to permit the jury to convict the defendant of kidnapping (MCL 750.349; MSA 28.581).*

7. KIDNAPPING — JURY INSTRUCTIONS — SPECIFIC INTENT.

*An instruction to the jury that to convict a defendant of kidnapping it was necessary to determine that the defendant intended to kidnap the victim without more was insufficient; an intent to kidnap is an intent to accomplish one of the purposes enumerated in the kidnapping statute (MCL 750.349; MSA 28.581).*

8. KIDNAPPING — HOMICIDE — MURDER.

*Murder is not a purpose enumerated in the kidnapping statute which will support a conviction of kidnapping where the victim is confined (MCL 750.349; MSA 28.581).*

*Frank J. Kelley,* Attorney General, *Louis J.*

*Caruso,* Solicitor General, *Robert E. Weiss,* Prosecuting Attorney, and *Donald A. Kuebler,* Chief, Appellate Division, for the people in *Wesley.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Wesley J. Nykamp,* Prosecuting Attorney, and *Gregory J. Babbitt,* Assistant Prosecuting Attorney, for the people in *Taormina, Gerald Phillips,* and *Phillip Phillips.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Harvey A. Koselka,* Prosecuting Attorney, and *Michael A. Nickerson,* Assistant Attorney General, for the people in *Threet* and *Dopp.*

*Richard J. Drew* for defendant Wesley.

*Carl Ziemba* for defendant Taormina.

*James S. Lawrence (Richard G. Chosid,* of counsel) for defendants Phillips.

*Graham A. Teague* for defendant Threet.

*Priscilla Ruesink Laidlaw* for defendant Dopp.

BOYLE, J.

I

In these cases we are asked to construe the Michigan kidnapping statute. MCL 750.349; MSA 28.581 provides:

"Any person who wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person *with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will,* shall be guilty

of a felony, punishable by imprisonment in the state prison for life or for any term of years." (Emphasis added.)

In form, the statute describes various types of conduct which must be done "wilfully, maliciously and without lawful authority" to constitute kidnapping. After listing the various forms of conduct, the statute describes several forms of intent.

The issue before us is whether the language of the statute emphasized above (the "intent section") applies to *all* of the forms of conduct which precede it or applies only to the form of conduct which immediately precedes it, *i.e.,* "forcibly seize or confine, . . . or inveigle or kidnap."

We hold that the "intent section" of the statute applies only to the form of conduct which immediately precedes it.

Thus, a person can be convicted of kidnapping if it is proven beyond a reasonable doubt that he or she wilfully, maliciously, and without lawful authority,

(a) forcibly or secretly confined or imprisoned any other person within this state against his will, *or*

(b) forcibly carried or sent such person out of this state, *or*

(c) forcibly seized or confined, or inveigled or kidnapped any other person

(1) with intent to extort money or other valuable thing thereby, *or*

(2) with intent either

(A) to cause such person to be secretly confined or imprisoned in this state against his will, or

(B) [to cause such person to be] in any way held to service against his will.

Interpreted in this manner, we conclude that

the statute includes several forms of "kidnapping" within its definition.[1]

## A

The portion of the statute contained in (a) above actually contains two separate descriptions of punishable conduct: forcible confinement or imprisonment and secret confinement or imprisonment. The forcible confinement section of the statute in (a) above, taken by itself, describes the common-law misdemeanor offense of false imprisonment:

> "False imprisonment, sometimes called false arrest, is the unlawful confinement of a person. It results from any unlawful exercise or show of force by which a person is compelled to remain where he does not wish to remain or go where he does not wish to go. It is a common-law misdemeanor." Perkins, Criminal Law (2d ed), p 171.

It is the forcible confinement section of the statute which formed the basis for the charge in *People v Otis Adams,* 34 Mich App 546; 192 NW2d 19 (1971). As Justice LEVIN there carefully noted: "the people do not charge that the victim was secretly confined." In forcible confinement, "an asportation or movement . . . is an essential element; [in secret confinement] movement is not an element, but secrecy of the confinement is required," 34 Mich App 551.

The distinction between false imprisonment (forcible confinement) and secret confinement kidnapping is that the former describes an unlawful seizure of a person against his will; the latter is an

---

[1] This view is not inconsistent with the holding of *People v Bergevin,* 406 Mich 307, 311; 279 NW2d 528 (1979). That case recognized that the kidnapping statute contained alternative definitions of the crime, but held that each of these alternative formulations did not constitute a separate and distinct crime for purposes of trial, conviction, sentencing, and double jeopardy.

unlawful seizure and detention of the person secretly against his will.

A forcible confinement kidnapping charge presents the most difficulties for several reasons. First, by its inclusion in the statute, it elevates a common-law misdemeanor to an offense punishable by life imprisonment. Second, as Justice LEVIN correctly pointed out while serving on the Court of Appeals:

"It is obvious that virtually any assault, any battery, any rape, or any robbery involves some 'intentional confinement' of the person of the victim. To read the kidnapping statute literally is to convert a misdemeanor, for example, assault and battery, into a capital offense." *Otis Adams,* 34 Mich App 560.

Third, because of the first two factors, this section of the kidnapping statute could be used by prosecutors as a vehicle for overcharging a defendant:

"A literal reading of the kidnapping statute would permit a prosecutor to aggravate the charges against any assailant, robber, or rapist by charging the literal violation of the kidnapping statute which must inevitably accompany each of those offenses." *Id.*

In order to preserve the forcible confinement section of the kidnapping statute from a charge of unconstitutionality, this Court has interpolated the element of asportation in connection with it. *People v Adams,* 389 Mich 222, 237-238; 205 NW2d 415 (1973).[2]

[2] Although the holding in *Adams* was constitutionally based, the false imprisonment portion of the kidnapping statute is not the same as the completely standardless provision struck down in *Giaccio v Pennsylvania,* 382 US 399; 86 S Ct 518; 15 L Ed 2d 447 (1965). Other jurisdictions which have limited the scope of their kidnapping statutes by interpolating asportation as an element have done so by

The Court in *Adams* held that in connection with forcible confinement, asportation must be more than merely incidental to a *lesser* underlying crime. In other words, if the movement of the victim, the asportation, was merely incidental to the underlying crime, for example, of felonious assault, it would not be sufficient asportation to support a conviction of kidnapping.

In *People v Barker,* 411 Mich 291, 301; 307 NW2d 61 (1981),[3] this Court applied the *Adams* asportation requirement in the context of a charge of first-degree criminal sexual conduct, MCL 750.349; MSA 28.581, a crime which involves punishment equal to that imposed for kidnapping. The Court said:

"In all cases where the charge is kidnapping, *except as noted in Adams,* in order to find defendant guilty, the factfinder must be satisfied that there was movement sufficient to satisfy the asportation requirement or its equivalent. *Where applicable,* the asportation element is crucial, regardless of the length of punishment mandated by the Legislature." (Emphasis added.)[4]

relying on principles of statutory interpretation. See, *e.g., People v Levy,* 15 NY2d 159; 256 NYS2d 793; 204 NE2d 842 (1965). Moreover, jurisdictions such as Wisconsin have read common-law kidnapping as beyond the scope of their statute because their Legislature had otherwise specifically criminalized false imprisonment as a misdemeanor, an option the Michigan Legislature has not undertaken.

[3] It is unclear whether *Barker* and the companion cases also involved charges of what has been labeled here as false imprisonment kidnapping. What is clear is that they did not proceed on a theory of secret confinement or of forcible confinement with intent to secretly confine. See discussion in Section C *infra.* To the extent that *Barker* has been understood to require asportation where the charge is secret confinement or forcible confinement with intent to secretly confine, that understanding is erroneous.

[4] In its holding in *Barker,* the Court seems to have departed from the intellectual underpinning of *Adams,* the need to prevent prosecutorial overcharging. We are not presented in these cases with underlying crimes involving equal punishment which do not also involve murder. Therefore we are not called upon to reexamine this aspect of *Barker.*

The Court did not, however, overrule or disapprove of the following statement found in *People v Adams,* 389 Mich 238:

"If the underlying crime involves murder, extortion or taking a hostage, movement incidental thereto is generally sufficient to establish a valid statutory kidnapping."

See *Barker,* 411 Mich 300, fn 5. Thus, *Barker* did not stand for the proposition that movement incidental to a crime involving murder is not sufficient asportation to support a statutory kidnapping conviction.

This interpretation is entirely consistent with the underlying rationale for the asportation requirement. As detailed by this Court in *Adams,* 389 Mich 230-235, the asportation element was necessary to distinguish "true kidnapping" from other crimes which carry *less* punishment and to protect against overcharging by prosecutors. See also *People v Levy,* 15 NY2d 159; 256 NYS2d 793; 204 NE2d 842 (1965), and *People v Lombardi,* 20 NY2d 266; 282 NYS2d 519; 229 NE2d 206 (1967).

But the asportation requirement was not designed to be applied indiscriminately to situations which do not present the evils which ought to be prevented:

"Moreover, the rule has no purpose of ignoring as independent crimes alternative or optional means used in committing another crime which, by the gravity and even horrendousness of the means used, constitute and should constitute a separately cognizable offense. *Nor was the Levy-Lombardi rule intended to exclude from the 'traditional' or 'conventional' kidnapping abductions designed to effect extortions or accomplish murder."* *People v Miles,* 23 NY2d 527, 539-540; 297 NYS2d 913; 245 NE2d 688 (1969). (Emphasis added.)

We are persuaded that it is completely appropriate to hold that movement incidental to a crime involving murder, extortion, or taking a hostage is sufficient for kidnapping because such conduct does not present the danger of overcharging.

Therefore, when an information charges an offense under the forcible confinement part of the kidnapping statute designated as section (a) above, the following elements must be proved beyond a reasonable doubt:

(1) a forcible confinement of another within the state,

(2) done wilfully, maliciously and without lawful authority,

(3) against the will of the person confined or imprisoned, and

(4) an asportation of the victim which is not merely incidental to an underlying crime *unless* the crime involves murder, extortion or taking a hostage. Asportation incidental to these types of crimes is sufficient asportation for a kidnapping conviction.

However, as previously noted, no movement is required where the victim was secretly confined, Perkins, *supra,* p 178.

### B

The portion of the statute denominated (b) above defines historical common-law kidnapping. "Any person who wilfully, maliciously and without lawful authority . . . shall forcibly carry or send such person out of this state . . . shall be guilty" of kidnapping. As mentioned above, the crime is complete with the forcible asportation of the victim across the state boundary.

### C

Section (c) of the outline of the statute produced

above describes three additional forms of conduct punishable as kidnapping. The first of these is "[a]ny person who wilfully, maliciously and without lawful authority . . . shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby . . . shall be guilty" of kidnapping.

This, of course, is kidnapping for ransom. It is regarded as one of the gravest of crimes and is appropriately punishable as a capital offense. See Perkins, Criminal Law (2d ed), p 180. Because it does not involve the dangers of inappropriate punishment or overcharging, there is no reason to interpolate asportation as an element when the charge is based on this portion of the statute.

The second form of conduct punishable as kidnapping under this section of the statute describes kidnapping with the intent to secretly confine. "Any person who wilfully, maliciously and without lawful authority . . . shall forcibly seize or confine, or shall inveigle or kidnap any other person . . . with intent . . . to cause such person to be *secretly* confined or imprisoned in this state against his will . . . shall be guilty" of kidnapping. (Emphasis added.)

The elements of a charge under this section of the statute are:

(1) a forcible seizure, confinement, inveigling or kidnapping of another,
(2) done wilfully, maliciously and without lawful authority,
(3) with the intent to cause such person to be secretly confined or imprisoned within the state against his will.

Since this form of kidnapping does not present

dangers of overcharging or inappropriate punishment, it is not necessary to interpolate asportation as an element. Although no movement is needed to establish the offense under (1) above, the proofs must establish a purpose to cause such secret confinement. Indeed, as Justice KAVANAGH opined in his concurring opinion in *People v Barker,* 411 Mich 303:

"The overbreadth we feared in *Adams* is avoided by insisting on proof of the intent specified in the statute as the *ultimate purpose* of the criminal act. So interpreted the statute would not elevate a misdemeanor to a felony as we feared in *Adams.* See 389 Mich 222, 232-233." (Emphasis in the original.)

We agree with the implicit suggestion by Justice KAVANAGH that a specific intent requirement obviates the need to read an asportation element into the statute. The intent to cause the victim to be secretly confined substitutes for the requirement of asportation. See Perkins, Criminal Law (2d ed), p 178.[5]

The third form of conduct punishable under this section of the statute is kidnapping with the intent to hold to service. "Any person who wilfully, maliciously and without lawful authority . . . shall forcibly seize or confine, or shall inveigle or kidnap

_____

[5] See also *People v Otis Adams,* 34 Mich App 550-551:

"There are two basic kidnapping patterns. In one, the victim is seized and removed to another place; in the other, the victim is confined in the place where he is found. In the first, an asportation or movement of the victim is an essential element; in the second, movement is not an element, but secrecy of the confinement is required."

Although it appears that Justice LEVIN made this statement in the context of a discussion of secret confinement as a form of conduct (see discussion of false imprisonment section of the statute, *supra,* pp 3-7), the rationale is equally applicable to an intent to cause secret confinement. Movement of the victim may be involved under a particular set of facts, but it is not an essential element of the crime.

any other person . . . with intent . . . to cause such person to be . . . in any way held to service against his will, shall be guilty" of kidnapping. For the same reasons as outlined above, the specific intent requirement makes an element of asportation unnecessary.

In summary, asportation is required as an element of kidnapping only where the charge is forcible confinement (a). Where the charge is secret confinement (b), or forcible seizure, or forcible confinement with intent to secretly confine (c), asportation is not an element of the offense.

## II

To summarize what has been stated above, the kidnapping statute sets punishment for six separate variations of conduct. The evidence presented in each of the cases at bar must be examined in order to assess the accuracy of the instructions in each case.

As the facts detailed in Justice KAVANAGH's opinion indicate, the record in each case shows only that the parties proceeded on a theory of what has been characterized here as false imprisonment kidnapping. See part I-A. Therefore, the jury instructions in each case must be examined to determine if they fairly and accurately apprised the jury of the elements of false imprisonment kidnapping by forcible confinement.

### Wesley

The trial court instructed the jury on the kidnapping charge as follows:

"For the crime of kidnapping the prosecutor must prove each of the following elements beyond a reason-

able doubt; any person who shall wrongfully, intentionally and forcibly confine another person against her will and move her from one place to another or cause her to be moved from one place to another is guilty of the crime of kidnapping. Mr. Wesley pled not guilty to that charge.

"And to establish the charge of kidnapping, the prosecutor must prove each of the following elements beyond a reasonable doubt: first, the victim, Carol Agee, must have been *forcibly confined or imprisoned.* Second, that such must have been done *against her will and without lawful authority.* Third, that during the course of such confinement the defendant must have forcibly *moved or caused the victim to be moved from one place to another for the purpose of abduction and kidnapping.* Such movement is not sufficient if it's part of a crime other than kidnapping. In this case, for instance, you should consider whether the movement was for the purpose of kidnapping or whether it was a part of the crime of murder.

"In determining whether or not the movement was for the purpose of kidnapping, you may consider whether the movement was for a few feet or for a substantial distance and whether it added any greater danger or threat to the victim than the crime of murder. If the *underlying crime involves murder, movement incidental to that is generally sufficient* to establish a valid statutory kidnapping. However, the evidence must convince you beyond a reasonable doubt that there was movement independent of the other crime and that it was for the purpose of kidnapping.

"Fourth, at the time of such confinement the defendant must have intended to kidnap the victim. And fifth, that at the time of such confinement the defendant must have been *acting wilfully and maliciously.*

"Wilful and malicious means that the defendant intentionally confined the victim knowing such confinement to be wrong and that it was done without legal justification or excuse." (Emphasis added.)

When these instructions are examined in light of the elements of false imprisonment kidnapping,

it is clear that the jury was adequately instructed on all of the elements of the crime. The jury was told that the victim must have been forcibly confined against her will, and that the defendant must have acted wilfully, maliciously, and without lawful authority.

The jury was also correctly instructed on the element of asportation. It was told that the victim must have been moved from one place to another for the purpose of abduction and kidnapping, but that movement incidental to an underlying crime involving murder was sufficient.

There is no error contained in these instructions that requires reversal. The jury was properly instructed on the elements of false imprisonment kidnapping and that movement incidental to the underlying crime of murder was sufficient. Therefore, defendant Wesley's conviction of first-degree felony murder, with kidnapping as the underlying felony, must stand.[6]

*Taormina, Gerald Phillips, and Phillip Phillips*

In connection with these defendants, the trial court instructed the jury in pertinent part as follows on the kidnapping charges:

"The elements or instructions with regard to kidnapping are as follows: Any person who shall wrongfully, intentionally and forcibly confine another person against his will and move him from one place to an-

---

[6] In each of these cases, the trial court instructed the jury that the specific intent to kidnap was an element of the crime charged. As indicated above, false imprisonment kidnapping is not a specific intent crime. However, defendant cannot complain concerning an error in a jury instruction which required more proof from the prosecutor than is necessary as a matter of law.

The same rationale applies to preclude defendant from complaining that the instruction seems to indicate at one point that asportation incidental to murder was *not* sufficient for kidnapping.

other or cause him to be moved from one place to another is guilty of this crime. The defendant pleads not guilty to this charge.

"To establish this charge the people must prove each of the following elements beyond a reasonable doubt. First, that the victim, J. P., or also known as James Grinwis, must have been *forcibly confined or imprisoned.* Second, the victim must have been so confined or imprisoned *against his will and without lawful authority.* Third, during the course of such confinement the defendant must have forcibly *moved or caused the victim to be moved from one place to another for the purpose of abduction and kidnapping.* Such movement is not sufficient if it is part of a crime other than kidnapping.

"In this case, for instance, you should consider whether or not the movement was for the purpose of kidnapping or whether it was a part of the crime of felonious assault.

"I will describe felonious assault to you in a few minutes. In determining whether or not the movement was for the purpose of kidnapping, you may consider whether the movement was for a few feet or whether it was for a substantial distance and whether it added any great danger or threat to the victim than the crime of felonious assault, however, *the evidence must convince you beyond a reasonable doubt that there was a movement independent of the other crime and that it was for the purpose of kidnapping.*

"Fourth, that at the time of such confinement the defendant must have intended to kidnap the victim. You will recall the instructions on specific intent which I said applies also to this charge of kidnapping.

"Fifth, at the time of such confinement the defendant must have been *acting wilfully and maliciously.* Wilfully and maliciously means that the defendant intentionally confined the victim knowing such confinement to be wrong and that he did so without legal justification or excuse." (Emphasis added.)

These instructions correctly informed the jury of

the elements of false imprisonment kidnapping. There is no error in these instructions which would support reversal of the defendants' convictions.

## *Threet* and *Dopp*

The trial court gave the following charge to the jury on the kidnapping count:

"To establish this charge the prosecution must prove each of the following elements beyond a reasonable doubt.

"First, the victim, John Korzek, must have been *forcibly seized, confined, or imprisoned.*

"Second, the victim must have been so confined *against his will.*

"Third, during the course of such confinement the defendant must have forcibly *moved the victim or caused him to be moved from one place to another for the purpose of abduction and kidnapping.*

"Fourth, at the time of such confinement the defendant must have intended to so kidnap or confine the victim.

"Fifth, in addition such kidnapping must have been done with the intent to confine or imprison the victim in this state; cause him in some way to be held for service against his will, or to murder the victim.

"Sixth, at the time of such confinement the defendant must have been *acting wilfully and maliciously.* Wilfully and maliciously means that the defendant intentionally confined the victim, knowing such confinement to be wrong; and that he did so without legal justification or excuse." (Emphasis added.)

These instructions correctly informed the jury that in order to convict the defendants it must find that the victim had been forcibly confined against his will and that the defendants must have acted

wilfully, maliciously and without legal justification or excuse.[7]

The Court of Appeals found error requiring reversal in the portion of the trial court's instruction which related to the asportation element:

"In the instant case, the trial court's instructions were deficient under *Barker.* While the court told the jury in paragraph three of its kidnapping charge that the movement must be for the purpose of abduction and kidnapping, it did not go on to inform the jury what movement would be insufficient to sustain a kidnapping charge as CJI 19:1:01 does. More importantly, paragraph five of the kidnapping charge specifically allowed the jury to base a conviction on a finding that the abduction was committed to murder the victim. Thus, the charge suffered from the same basic defect that rendered the charge in *Barker* fatally erroneous. That is, it allowed the jury to base a kidnapping conviction on a finding that the movement was either for the purpose of kidnapping the victim *or* to commit the crime of assault with intent to murder." Unpublished opinion per curiam of the Court of Appeals, decided on March 24, 1982 (Docket Nos. 54352, 55305).

However, as the discussion of the asportation element above indicates, the Court of Appeals misapplied *Barker. Barker,* when read in connection with *Adams,* does not change the rule that movement of the victim incidental to an underlying crime which involves murder is sufficient asportation to support a kidnapping conviction. An underlying charge of assault with intent to commit murder is certainly a crime *involving* murder.[8]

---

[7] As in the *Wesley, Taormina,* and *Phillips'* cases, defendants here cannot claim error in connection with a specific intent instruction which was not required. See fn 6.

[8] When the rationale for the asportation rule is examined, there is no principled reason why a different rule should apply to a defendant who acts with the intent to murder, but who is unsuccessful in bringing that intent to fruition by causing the death of the victim.

Thus, there was no error in the charge attributable to the fact that the jury could have based its kidnapping conviction on movement incidental to the crime of assault with intent to commit murder. Accordingly, the kidnapping convictions of these defendants must be reinstated.

For the reasons stated above, we affirm the judgment of the Court of Appeals in *Wesley, Taormina, Gerald Phillips*, and *Phillip Phillips* and reverse the judgment of the Court of Appeals in *Threet* and *Dopp,* reinstating the judgments of the trial court. We find the assignments of error by Threet and Dopp as cross-appellants to be without merit, and we decline to address issues not raised in the Court of Appeals.

WILLIAMS, C.J., and RYAN and BRICKLEY, JJ., concurred with BOYLE, J.

LEVIN, J. *(dissenting).* In each of these cases, consolidated on appeal, the defendants were charged with multiple offenses including kidnapping.[1] They were all convicted of kidnapping. Wesley was also convicted of first-degree felony murder.[2] Taormina, Gerald Phillips, and Phillip Phil-

---

See discussion *supra,* pp 4-6. Indeed, in *People v Miles, supra,* in which the murder-kidnapping asportation rule was articulated, the victim was not killed.

[1] "Any person who wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years." MCL 750.349; MSA 28.581.

[2] MCL 750.316; MSA 28.548.

Trial testimony indicated that a woman died as the result of a bullet wound suffered during an altercation between the woman, Wesley, and a companion of Wesley in the back seat of an automobile.

lips, convicted of kidnapping, were acquitted of conspiracy to commit murder.[3] Threet and Dopp,

The two men had just walked out of a bar when the companion suddenly leaped through the open passenger-side window of a moving automobile occupied by the victim and another woman. Wesley opened the passenger door and the second woman leaped out of the car and ran. Wesley got in the back seat of the car and his companion drove five or six blocks and parked. A struggle ensued between the victim and the companion in the front seat and the victim was thrown into the back seat. Shortly thereafter, the fatal shot was fired.

Wesley testified that he believed that his companion intended to rape the victim. He also testified that the victim bit his arm and pulled a gun from her purse, and that the gun discharged when he attempted to wrest it from her possession. One witness who lived in the neighborhood testified that several neighbors were awakened by the altercation and that members of her household called the police four times while the incident was in progress.

The Court of Appeals affirmed the defendant's conviction of first-degree felony murder. *People v Wesley,* 103 Mich App 240; 303 NW2d 194 (1981).

[3] MCL 750.157a, 750.316; MSA 28.354(1), 28.548.

The Court of Appeals summarized the facts in this case:

"[I]t appears that a Michigan State Police officer was assigned to make undercover narcotics purchases and was introduced by his superior officer, Sergeant William Morris, to a narcotics informant identified as John T. on October 19, 1976. The next day, John T. accompanied the trooper, who was given the street name of J. P., to a place known as Cheyenne Ranch in Ottawa County, Michigan. Their purpose was to meet James Atherton, a purported narcotics supplier. Atherton was not at the ranch so they went to Atherton's place of employment, a shop on 28th Street in Wyoming known as the Forty Winks Shop. There they found Atherton, and the three of them repaired to a nearby restaurant where they discussed narcotics sales. Trooper J. P. let it be known that he would be interested in purchasing narcotics and gave Atherton a phone number where he could be reached. The next day, the trooper took John T. to Detroit and left him at a run-down hotel in the inner city.

"To understand the story, it is necessary to change the scene to Sterling Heights, Michigan, and the home of Samuel Taormina, a jeweler. On October 25, 1976, two men, one armed with a sawed-off shotgun, entered Taormina's home and robbed him of $30,000 in cash and a large amount of jewelry. After the robbery, the two men tied up Taormina and a girl living in the home and fled in a white car. During the robbery, Taormina recognized John T. as one of the robbers. He had been introduced to John T. earlier by a mutual acquaintance, a girl by the name of Krissy. During the robbery, Taormina heard John T. call his assistant 'J. P.' By utilizing his connections with Krissy and others, Taormina discovered that John T., accompanied by a man known as J. P., had been attempting to acquire drugs from James Atherton in the Grand Rapids area. Taormina enlisted the defendants, Gerald and Phillip Phillips, and drove

to Atherton's Cheyenne Ranch. Apparently, the parties, Taormina, the Phillips brothers, and Atherton, were unknown to each other, and the only connection was their mutual acquaintance with Krissy.

"Taormina, however, was successful in getting Atherton's assistance in attempting to lure J. P. to the Cheyenne Ranch. At 3:40 a.m. on October 29, Atherton called J. P. and told him that some people were in from Detroit and were ready to do business. J. P. refused to do business because of the lateness of the hour. After several calls, J. P. told Atherton he would meet them at 11 a.m. at the Forty Winks store. At 10:15 a.m., Atherton called to say that his people were still around and would meet J. P. at Farmer John's Restaurant, from which Atherton was calling. J. P. then called his supervisor, Sergeant Morris, who provided him with money and equipped him with an audio transmitter. Sergeant Morris quickly recruited a back-up surveillance team of detectives from nearby cities. J. P. went to Farmer John's and there met Atherton and defendant Gerald Phillips, who was introduced as 'Tim.' Atherton was dispatched to the ranch to get a 'sample.' After he left, Gerald Phillips and J. P. discussed the materials, and J. P. told Phillips that he was not interested in marijuana but wanted cocaine or heroin. Phillips responded that he only had an ounce. Phillips then suggested that they go out to the ranch and save Atherton the trip back. J. P. agreed. On the way to the ranch, they met Atherton coming back to the restaurant. J. P. pulled over, but Phillips told him to drive on and directed him into an area near the bunkhouse. Atherton, Taormina, and Phillip Phillips pulled in behind. At that time, Gerald Phillips pointed a .38 caliber revolver at J. P. and pulled the keys out of the car. J. P. told Phillips that if he wanted his money to take it, but 'just don't shoot me.' Phillips responded by saying, 'It's not the money we want, it's you.' J. P. was then asked, 'Where is John T.?' Atherton said, 'Don't shoot him here, there is too many people around.' Taormina ordered J. P. to get into the 'black ride,' meaning a black Cadillac parked nearby. Atherton told Gerald Phillips, 'Give me the keys. I'll take care of the car.' J. P. was shoved on his back into the front of the Cadillac. When Gerald Phillips looked away, J. P. reached for his gun, which was located in a belt at the small of his back. As he reached for the gun, his elbow caught in the back of the seat. Gerald Phillips saw what he was doing and put his gun to J. P.'s head saying, 'Let go, or you are dead.' J. P. said, 'Okay, take the gun. Just don't shoot.'

"Taormina then asked for J. P.'s other gun, saying he knew that he had a sawed-off shotgun. J. P. denied having a shotgun, whereupon Taormina replied, 'Okay, we will just take him out and blow his head off.' Gerald Phillips commented, 'Let's get it over with.' J. P. was forced into the back seat; Taormina drove. Phillip Phillips rode up front, and Gerald Phillips got into the back seat. As the car came to the end of the drive to the ranch and slowed for traffic at the highway, Sergeant Morris, who had heard much of the conversation from the trooper's audio transmitter, pulled up with three other officers. J. P. pushed Gerald Phillips' gun from his side, locking his hand in a position so that the hammer could not be raised. Phillips squeezed the trigger, but it could not fire. Finally, a detective came to

convicted of kidnapping, were also convicted of assault with intent to commit murder[4] and possession of a firearm during the commission of a felony.[5]

---

his assistance, and J. P. got control of the gun. Taormina, Gerald Phillips, and Phillip Phillips were arrested, and Atherton was arrested at the bunkhouse."

The jury acquitted the defendants of conspiracy to commit murder but found each defendant guilty of kidnapping. The Court of Appeals affirmed. *People v Phillips*, 112 Mich App 98; 315 NW2d 868 (1982); *People v Taormina*, unpublished per curiam opinion decided April 30, 1981 (Docket Nos. 77-4396, 77-4397).

[4] MCL 750.83; MSA 28.278.

[5] MCL 750.227b; MSA 28.424(2).

The Court of Appeals summarized the facts as follows:

"The evidence at trial tended to show the following. Michigan State Police officer John Korzek attempted to complete an undercover drug transaction with defendant James Threet. Korzek entered a brown Ford, driven by Threet, presumably to make the planned exchange. Threet soon thereafter pointed a gun at Korzek and advised him that:

" 'We're going to [go] to a house. We're going to give you a bath. We're going to check you out. If you're a cop or if you're wired or if you aren't who you say you are, you're a dead motherfucker.' He said, 'But if you're cool,' he said, 'We can make lots of money, you know, and we're in business.' 'But,' he said, 'Don't move.' He said, 'Don't try anything because I'll blow you away.' "

"Threet informed Korzek that two men would be coming to identify whether Korzek was a cop.

"Threet picked up an individual named Jerry Woodby at a bar. Woodby produced a sawed-off shotgun which he held on Korzek while Threet drove.

"As the trio passed a church parking lot, Threet sounded the Ford's horn and a red Trans Am pulled out of the lot. This car, identified as belonging to James Threet, was driven by defendant Dopp.

"Dopp followed Threet at a high rate of speed across back roads of Lenawee County. Thereafter, the vehicles arrived at a railroad crossing where a passing train stopped their progress. At this point, Threet decided to switch cars and walked to the Trans Am. Dopp relayed Threet's instruction to Woodby to bring Korzek to the other vehicle. Woodby thereupon took Korzek at gunpoint back to the red Trans Am. Korzek subsequently knocked Woodby down and escaped. During the escape, gunshots were fired. The prosecution introduced into evidence Korzek's leather jacket which bore a small hole."

Both defendants were convicted of kidnapping, assault with intent to commit murder, and possession of a firearm during the commission of a felony. The Court of Appeals reversed the kidnapping convictions, stating:

"The Michigan Supreme Court recently held in *People v Barker*, 411 Mich 291; 307 NW2d 61 (1981), that, to sustain a kidnapping

The principal question concerns the meaning of the words "wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will" and, in particular, the meaning of the words "forcibly confine."

I

Most rapes, robberies, murders, and physical assaults or attempts to commit those offenses involve, at least temporarily, a detention or movement of the victim that could be characterized as a "forcible confinement." Nevertheless, we find no report of a prosecution in this state for kidnapping *and* rape, robbery, murder, or other assaultive offense in the 125 years following the enactment of the Revised Statutes of 1838.[6] The practical construction of the term "forcible confinement" for over 125 years was that it did not include a bodily

conviction, the factfinder must conclude that the movement of the victim was not merely incidental to some other offense, but, rather, had independent significance evincing an intent and purpose to kidnap.

"In the instant case, the trial court's instructions were deficient under *Barker.* While the court told the jury in paragraph three of its kidnapping charge that the movement must be for the purpose of abduction and kidnapping, it did not go on to inform the jury what movement would be insufficient to sustain a kidnapping charge as CJI 19:1:01 does. More importantly, paragraph five of the kidnapping charge specifically allowed the jury to base a conviction on a finding that the abduction was committed to murder the victim. Thus, the charge suffered from the same basic defect that rendered the charge in *Barker* fatally erroneous. That is, it allowed the jury to base a kidnapping conviction on a finding that the movement was either for the purpose of kidnapping the victim *or* to commit the crime of assault with intent to murder." *People v Threet,* unpublished per curiam opinion decided March 24, 1982 (Docket Nos. 54352, 55305).

[6] Historically, at least prior to the 20th Century, it appears that kidnapping was rarely if ever charged in cases involving rape, robbery, or murder. See, *e.g.*, the following sections of the Century Edition of the American Digest: vol 14, Criminal Law, §§ 386-403; vol 26, Homicide, §§ 24-25; vol 31, Kidnapping, §§ 1-12.

restraint incidental to the commission of another assaultive offense.

A

When kidnapping was first proscribed by statute in the territorial laws[7] and in the Revised Statutes of 1838,[8] other provisions proscribed murder,[9] rape,[10] and robbery.[11] The statutory offense of kidnapping filled a gap in the criminal law by making it unlawful forcibly to confine a victim for a purpose that did not otherwise constitute an offense involving a physical assault.[12] Absent a kidnapping statute, bodily restraint to accomplish secret confinement or involuntary service might remain unpunished. It appears from the practical construction of practitioners for over 125 years that it was not intended that kidnapping be charged where the bodily restraint or the movement of the victim was incidental to the commission of a separately punishable offense involving a physical assault.

We agree with Justice KAVANAGH that the Legislature intended to proscribe as kidnapping a forcible detention or movement of a person with

[7] 1 Laws of the Territory of Michigan, § 45, p 127. See Appendix.

[8] RS 1838, part 4, title I, ch 3, § 17. See Appendix.

[9] 1 Laws of the Territory of Michigan, § 1, p 109; RS 1838, part 4, title I, ch 3, § 1.

[10] 1 Laws of the Territory of Michigan, § 5, p 109; RS 1838, part 4, title I, ch 3, § 15.

[11] 1 Laws of the Territory of Michigan, § 27, p 118; RS 1838, part 4, title I, ch 3, § 12.

[12] The gist of kidnapping at common law was a restraint of the body plus an asportation of such significance that the victim could not rely on the law or friendly assistance to gain release. See *Smith v State*, 63 Wis 458; 23 NW 879, 882 (1885); ALI, Model Penal Code (1980 Official Draft and Revised Comments), § 212.1, Comment 1, p 210.

For discussions of the common-law offense of kidnapping, see Note, *A rationale of the law of kidnapping*, 53 Colum L R 540 (1953); Model Penal Code, *supra*, p 210; 2 Torcia, Wharton's Criminal Law (14th ed), § 210, p 343.

the intent to extort or bring about secret confinement or involuntary service. The statutory offense of kidnapping, however, also includes other forcible confinements. A detention or movement to terrorize the victim or someone else—without intent physically to assault or rob the victim—constitutes kidnapping although there may be no design to extort or cause secret confinement or involuntary service.

## B

The maximum punishment for kidnapping originally was less than the maximum punishment prescribed for other assaultive offenses.

Kidnapping at common law was a misdemeanor.[13] When the present structure and pertinent language of the kidnapping statute were first enacted, kidnapping was made a felony and the maximum punishment was fixed at ten years imprisonment.[14]

Other provisions of the Revised Statutes of 1838 proscribed assault-related offenses that carried greater maximum punishments, *e.g.,* first-degree murder (death), second-degree murder (life), assault with intent to murder (20 years), attempt to murder by means not constituting assault (20 years), armed robbery with intent to kill if resisted (life), armed assault with intent to rob (20 years), rape (life), and assault with intent to rape (20 years).[15] Unarmed assault with intent to rob and

---

[13] See Perkins & Boyce, Criminal Law (3d ed), p 229.

[14] RS 1838, part 4, title I, ch 3, § 17.

[15] RS 1838, part 4, title I, ch 3, §§ 1, 8-11, 15-16.

The current Penal Code proscribes first-degree murder (mandatory life imprisonment), MCL 750.316; MSA 28.548, second-degree murder (life), MCL 750.317; MSA 28.549, assault with intent to murder (life), MCL 750.83; MSA 28.278, assault with intent to do great bodily harm less than murder (10 years), MCL 750.84; MSA 28.279, armed robbery

steal also was punishable by 10 years imprisonment.[16]

All sentences for offenses committed at the same time run concurrently.[17]

The statutory constructional questions presented by these consolidated appeals result from two relatively recent amendments of the Penal Code that have led to the lodging of charges of kidnapping in circumstances where it was not charged theretofore. The definition of first-degree murder was amended in 1969[18] to include kidnapping as a felony aggravating second-degree murder to first-degree (felony) murder punishable by mandatory life imprisonment without possibility of parole. The criminal sexual conduct statute,[19] enacted in 1974, graded sexual assaults so that what was a forcible rape at common law is no longer a life sentence offense unless accompanied by aggravating factors such as the commission of another felony.

C

Although i) the maximum punishment for kidnapping has been increased from 10 years imprisonment to life imprisonment, and ii) the commission of a kidnapping is now a factor that aggravates the punishment for both second-degree murder and third-degree criminal sexual conduct, the

(life), MCL 750.529; MSA 28.797, armed assault with intent to rob and steal (life), MCL 750.89; MSA 28.284, unarmed robbery (15 years), MCL 750.530; MSA 28.798, first-degree criminal sexual conduct (life), MCL 750.520b; MSA 28.788(2) and third-degree criminal sexual conduct (15 years), MCL 750.520d; MSA 28.788(4).

[16] RS 1838, part 4, title I, ch 3, § 13. The current Penal Code provides a maximum punishment of 15 years imprisonment for unarmed assault with intent to rob and steal. MCL 750.88; MSA 28.283.

[17] See *In re Bloom,* 53 Mich 597, 598; 19 NW 200 (1884).

[18] 1969 PA 331. MCL 750.316; MSA 28.548.

[19] 1974 PA 266. MCL 750.520a *et seq.;* MSA 28.788(1) *et seq.*

structure and definitional language of the kidnap-
ping statute have remained intact since 1838.[20]
The conduct proscribed by the present statute may
thus be identified with reference to the intent of
the Legislature when the "forcible confinement"
formulation was first enacted in 1838.

We would hold that the meaning ascribed to the
words "forcibly confine" for over 125 years did not
change when the Legislature aggravated the pen-
alties for second-degree murder or third-degree
criminal sexual conduct where either of those
offenses was committed together with kidnapping.
If the felonious intent of the actor at the time the
victim is forcibly detained or moved includes com-
mission of another physically assaultive offense,
the detention or movement is not a "forcible con-
finement" within the meaning of the kidnapping
statute.

## D

If the actor at the time he forcibly detains or
moves the victim has the felonious intent to extort
money or to hold the victim as a hostage for some
purpose other than physical assault, or to terrorize
the victim or someone else, but does *not* intend
physically to assault the victim or steal money or
other property from him, the actor is guilty of
kidnapping. The actor continues to be guilty of
committing that offense if, after so detaining or
moving the victim, he forms an additional feloni-
ous intent and acts[21] on such additional intent by
committing another physically assaultive offense
on the victim so previously detained or moved.

Where there is evidence that supports a finding

[20] For a more detailed consideration of the evolution of the Michi-
gan kidnapping statute, the reader may wish to refer to the Appen-
dix.

[21] Including an overt act making out an attempt.

that at the time of the detention or asportation of
the victim the actor had a felonious intent other
than to rob, rape, murder, or otherwise physically
assault the victim, but the same or other evidence
would support a jury inference of an intent to so
assault the victim, the jury should be instructed
that it cannot convict the defendant of both kid-
napping and such other assaultive offense unless it
finds that the intent to commit the other assaul-
tive offense was formed after the forcible detention
or movement of the victim.

## II

The jurisprudential issue presented in the in-
stant cases is essentially the issue presented in
*People v Chessman*,[22] where, in 1951, the Supreme
Court of California held that any asportation,
however slight, is sufficient to constitute kidnap-
ping. Chessman was convicted and executed for
violating the California kidnapping statute[23] when,
during the course of a robbery, he forced his
victim to move 22 feet to his automobile where he
sexually assaulted her. The Supreme Court of
California said: "It is the fact, not the distance, of
forcible removal which constitutes kidnapping in
this state."[24]

Nine years after Chessman was executed in
1960, the Supreme Court of California overruled
the "any asportation" formulation and said:

"In the present case . . . defendants had no interest

[22] 38 Cal 2d 166; 238 P2d 1001 (1951), *cert den* 343 US 915 (1952),
*reh den* 343 US 937 (1952).

[23] At the time of *Chessman,* Cal Penal Code § 209 provided:

"Any person . . . who kidnaps or carries away any individual to
commit robbery . . . shall suffer death or shall be punished by
imprisonment in the state prison for life without possibility of parole
. . . in cases in which the [victim suffers] bodily harm."

[24] 38 Cal 2d 192.

in forcing their victims to move just for the sake of moving; their intent was to commit robberies and rapes, and the brief movements which they compelled their victims to perform were solely to facilitate such crimes. It follows, a fortiori, that those movements were 'incidental to' the robberies and rapes . . . and that 'the Legislature could not reasonably have intended that such incidental movement be a taking . . . .' "[25]

This Court[26] and courts[27] in Colorado, the District of Columbia, Florida, Illinois, Iowa, Kansas, Mississippi, Missouri, Nevada, New York, North Carolina, Ohio, Oregon, Rhode Island, South Dakota, and Washington have followed the lead of the later Supreme Court of California decision and rejected the view that any asportation, however slight, constitutes kidnapping.

[25] *People v Daniels,* 71 Cal 2d 1119, 1130-1131; 459 P2d 225; 80 Cal Rptr 897; 43 ALR3d 677 (1969).

[26] *People v Adams,* 389 Mich 222; 205 NW2d 415; 59 ALR3d 1288 (1973); *People v Barker,* 411 Mich 291; 307 NW2d 61 (1981).

[27] *People v Bridges,* 199 Colo 520; 612 P2d 1110 (1980) *(en banc); Robinson v United States,* 388 A2d 1210 (DC App, 1978); *Faison v State,* 426 So 2d 963 (Fla, 1983); *People v Smith,* 91 Ill App 3d 523; 414 NE2d 1117 (1980); *State v Rich,* 305 NW2d 739 (Iowa, 1981); *State v Buggs,* 219 Kan 203; 547 P2d 720 (1976); *Cuevas v State,* 338 So 2d 1236 (Miss, 1976); *State v Johnson,* 549 SW2d 627 (Mo App, 1977); *Wright v State,* 94 Nev 415; 581 P2d 442 (1978); *People v Levy,* 15 NY2d 159; 256 NYS2d 793; 204 NE2d 842 (1965), *cert den* 381 US 938 (1965); *State v Fulcher,* 294 NC 503; 243 SE2d 338 (1978); *State v Logan,* 60 Ohio St 2d 126; 397 NE2d 1345 (1979); *State v Garcia,* 288 Or 413; 605 P2d 671 (1980); *State v Innis,* 433 A2d 646 (RI, 1981), *cert den* 456 US 930 and 456 US 942 (1982); *State v Reiman,* 284 NW2d 860 (SD, 1979); *State v Green,* 94 Wash 2d 216; 616 P2d 628 (1980).

*Contra, State v Linden,* 136 Ariz App 129; 664 P2d 673 (1983); *State v Briggs,* 179 Conn 328; 426 A2d 298 (1979), *cert den* 447 US 912 (1980); *Chambley v State,* 163 Ga App 502; 295 SE2d 166 (1982) (adhering to the rule that any asportation, however slight, will support kidnapping conviction, but also criticizing the rule and calling for legislative amendment); *Feller v State,* 264 Ind 541; 348 NE2d 8 (1976); *State v Schmidt,* 213 Neb 126; 327 NW2d 624 (1982); *Rodriquez v State,* 646 SW2d 524 (Tex App, 1982); *State v Simpson,* 118 Wis App 2d 454; 347 NW2d 920 (1984).

See generally Anno: *Seizure or detention for purpose of committing rape, robbery, or similar offense as constituting separate crime of kidnapping,* 43 ALR3d 699.

## III

The opinion of the Court errs fundamentally in stating, in effect, that incidental, forcible movement of a victim constitutes kidnapping where the underlying offense is murder rather than rape, robbery, or some other bodily assault.

In *State v Green*,[28] 94 Wash 2d 216; 616 P2d 628 (1980), and *State v Innis*,[29] 433 A2d 646 (RI, 1981),

[28] The defendant was charged with aggravated murder in the first degree in the furtherance of first-degree kidnapping or first-degree rape. The evidence indicated that the victim, an eight and one-half-year-old girl, had taken a younger child for a walk down an alley adjacent to the apartment where both lived. At approximately 5 p.m., witnesses in the area heard screams coming from the alley. Within fifteen seconds of the first scream, one witness, a resident of the apartment house, looked from his second story balcony and saw two people almost directly below him on the sidewalk bordering the alley. He recognized one as the victim and the other as an adult male. The man lifted the victim off her feet and, as she screamed and kicked, he placed his hand over her mouth in an apparent attempt to silence her. The victim at this time was fully clothed. The witness watched the man carry the victim a short distance along the sidewalk until they disappeared around the corner toward the back of the apartment. The victim's screams ceased within moments after she was out of view of the witness. When the witness looked down to where the victim and her assailant had been seen originally, he saw a butcher knife lying in one of two adjoining pools of blood. When the witness left his apartment and ran down the back stairs of the apartment house, he observed the assailant holding his victim at the bottom of the stairs near the entrance to the exterior loading area of the apartment house. The witness was not sure whether the victim was dead. However, he observed that much of her clothing had been ripped away and that the man's clothing was covered with blood.

The defendant was convicted of aggravated murder and sentenced to death. Upon its first consideration of the case, the Supreme Court of Washington affirmed the conviction, but remanded for reimposition of sentence. *State v Green,* 91 Wash 2d 431; 588 P2d 1370 (1979). On reconsideration, the Supreme Court of Washington remanded for a new trial on the charge of aggravated murder because the jury may have concluded impermissibly that the defendant committed murder in the furtherance of a kidnapping.

[29] The defendant was charged with murder, kidnapping, and robbery. The facts were described by the Supreme Court of Rhode Island:

"In the early weeks of January 1975, Innis brought a shotgun to his girl friend's apartment and in her presence sawed off the weapon's stock and barrel. On the evening of January 12, 1975, he wrapped the shotgun in a blue and white blanket, went to the adjoining apart-

*cert den* 456 US 930 and 456 US 942 (1982), the incidental movement of murder victims was held insufficient to constitute kidnapping.

In *Green,* the Supreme Court of Washington said:

"Moreover, although appellant lifted and moved the

ment, and asked the owner of the building to call a cab for him. When the first cab never arrived, a second was called. The dispatcher of the Silver Top Cab Company sent cab No. 21, with John Mulvaney driving, to pick up Innis. The owner of the building later testified that while Innis waited for the cab, he had a blue and white blanket 'cradled' in his arms. When the cab arrived, Innis placed the blanket in the back seat and sat in front with Mulvaney. Mulvaney radioed the dispatcher that he was taking his fare to East Greenwich. That was the last anyone heard from Mulvaney.

* * *

"On the morning of January 16, Silver Top Cab 21 was found abandoned in Coventry approximately one-quarter mile off Weaver Hill Road. The nude body of John Mulvaney was discovered in a shallow grave some eight hundred yards from the cab. A blue and white blanket was found some two hundred yards from the cab. Medical testimony revealed that Mulvaney had died as a result of a shotgun blast fired at close range at the back of his head." 433 A2d 648-649.

The evidence also indicated that the victim, Mulvaney, should have had in his possession approximately $20 in fares collected prior to the time he picked up Innis, but that only $2 was found in the cab. Innis was convicted of murder, kidnapping, and robbery. On appeal, the Supreme Court of Rhode Island originally vacated the convictions because of a violation of the defendant's Fifth Amendment rights. *State v Innis,* 120 RI 641; 391 A2d 1158 (1978). The United States Supreme Court vacated and remanded. *Rhode Island v Innis,* 446 US 291; 100 S Ct 1682; 64 L Ed 2d 297 (1980). On remand, the Rhode Island Supreme Court held that the defendant should have been acquitted of the kidnapping charge, since the confinement and asportation of the victim had no significance independent of the robbery and murder.

Apparently the Rhode Island kidnapping statute contains language similar to the Michigan kidnapping statute. As described by the Court:

"In essence, [the statute] provides that anyone who secretly or forcibly confines or imprisons another against his will within this state or carries or sends another person out of the state or intends to do the same shall be subject to imprisonment for a term of up to twenty years; and whoever commits any of the offenses mentioned within the chapter with intent to extort money or some other thing of value will be guilty of a felony and, on conviction, subject to a prison term from a maximum of life imprisonment to a minimum of 5 years' incarceration." 433 A2d 652-653.

victim to the apartment's exterior loading area, it is clear these events were actually an integral part of and not independent of the underlying homicide. While movement of the victim occurred, the mere *incidental* restraint and movement of a victim which might occur during the course of a homicide are not, standing alone, indicia of a true kidnapping." 94 Wash 2d 226-227.

In *Innis,* the Supreme Court of Rhode Island said:

"The history of our statute and the experience of other jurisdictions suggest that conduct that was traditionally considered to be an integral element of another crime cannot be punished as kidnapping. . . . Therefore, we hold that confinements that are incidental to the commission of a crime are not punishable under [the Rhode Island kidnapping statute].

\* \* \*

"In applying this standard to the case at bar, it seems apparent that the confinement and asportation of the cab driver had no significance independent of the robbery and murder. Therefore, the trial justice erred by failing to grant the motion for acquittal as it related to the kidnapping count." 433 A2d 655.

## A

The underlying offenses in the instant cases were murder, conspiracy to commit murder, and assault with intent to commit murder. The majority opinion points to the following statement in the opinion of the Court in *People v Adams,*[30] 389

[30] In *Adams,* the victim was seized in Jackson state prison by the defendant and moved some 1500 feet from one part of the prison to another. This Court reversed the defendant's conviction for kidnapping, holding that "the movement element must not be merely incidental to the commission of a lesser underlying crime, *i.e.,* it must be incidental to the commission of the kidnapping." 389 Mich 236.

In *People v Barker,* 411 Mich 291; 307 NW2d 61 (1981), this Court held that movement merely incidental to the commission of the underlying co-equal offense of first-degree criminal sexual conduct does not satisfy the asportation element of kidnapping.

Mich 222, 238; 205 NW2d 415 (1973):

"If the underlying crime involves murder, extortion or taking a hostage, movement incidental thereto is generally sufficient to establish a valid statutory kidnapping."

The signers of the majority opinion find it "completely appropriate to hold that movement incidental to a crime involving murder . . . is sufficient for kidnapping because such conduct does not present the danger of overcharging." *Ante,* p 388. They rely on the statement in *People v Miles,*[31] 23 NY2d 527, 539; 297 NYS2d 913; 245 NE2d 688 (1969), that "traditional" or "conventional" kidnapping included "abductions designed to effect extortions or accomplish murder."

The position stated in the majority opinion appears to be *Chessman* revisited. "Room-to-room kidnapping"—where the victim is moved from room to room in the course of a robbery,[32] rape,[33] or murder—would again have judicial approval where the movement occurred in the course of a

---

Neither *Adams* nor *Barker* involved a charge of kidnapping where murder was the underlying offense.

[31] It is not clear that the transportation in *Miles* was merely incidental to the offense of attempted murder. The New York Court of Appeals characterized the asportation as involving "changes in purpose and direction" and "for purposes connected with but not directly instrumental to the attempt to kill [the victim]." 23 NY2d 539. Therefore, the so-called *"Levy-Lombardi* rule," which applies where the restraint and asportation are merely incidental to the crimes ultimately committed, arguably did not apply in *Miles* by its own definition, since the asportation arguably was *more* than incidental to an underlying offense.

[32] *People v Knowles,* 35 Cal 2d 175; 217 P2d 1 (1950), *cert den* 340 US 879 (1950) (storekeeper forced into back room and robbed); *People v Tanner,* 3 Cal 2d 279; 44 P2d 324 (1935) (robbery victim forced from garage into home).

[33] *People v Wein,* 50 Cal 2d 383; 326 P2d 457 (1958), *cert den* 358 US 866 (1958), *reh den* 358 US 896 (1958), *cert den* 359 US 942 and 359 US 992 (1959) (rape and robbery victim forced from room to room in own apartment).

murder. "True kidnapping" in the "traditional" or "conventional" sense, however, does not occur whenever there is incidental movement, however slight, of a murder victim.[34]

The opinion of the Court does not offer any explanation or support for its assertion that "movement incidental to a crime involving murder . . . does not present the danger of overcharging."[35] *Ante,* p 388. The Court's assertion is simply not true.

First-degree murder is punishable by mandatory life imprisonment *without* the possibility of parole. Second-degree murder is punishable by imprisonment for *any term of years* or life, *with* the possibility of parole. Today's decision of this Court means that the maximum penalty for second-degree murder may be increased to mandatory life

[34] See *State v Green,* 94 Wash 2d 216, 226-227; 616 P2d 628 (1980).

[35] It has been recognized that kidnapping statutes present the danger of overcharging:

"The other potential danger which a rational penal code must avoid is that the definition of kidnapping will sweep within its scope conduct that is decidedly wrongful but that should be punished as some other crime. Thus, for example, the robber who forces his victim to move from one room to another in order to find a cash box or open a safe technically may commit kidnapping as well as robbery. This reasoning raises the possibility of cumulative penalties or of higher sanctions for kidnapping, even though the 'removal' of the victim to another place was part and parcel of the robbery and not an independent wrong. Similarly, many instances of forcible rape involve some coerced movement of the victim or unlawful restraint for enough time to complete the sex act. Again, the actor may be liable for both kidnapping and rape, even though such asportation or detention of the victim is a criminologically insignificant circumstance in a course of conduct constituting rape. Definition of kidnapping to exclude such cases is a task of special subtlety for, unless particular care is taken, trivial aspects of robbery, rape, or some other crime will end up classified as the most serious version of kidnapping." ALI, Model Penal Code (1980 Official Draft and Revised Comments), § 212.1, Comment 2, pp 220-221.

See also *Chatwin v United States,* 326 US 455, 464; 66 S Ct 233; 90 L Ed 198 (1946); *People v Daniels,* 71 Cal 2d 1119; 459 P2d 225, 237; 80 Cal Rptr 897; 43 ALR3d 677 (1969); *Government of the Virgin Islands v Berry,* 604 F2d 221, 226 (CA 3, 1979); Note, *A rationale of the law of kidnapping,* 53 Colum L R 540, 556 (1953).

whenever there is incidental movement of the victim without evidence either of (i) premeditation and deliberation or (ii) perpetration or attempted perpetration of a statutorily enumerated felony other than the Court's newly formulated "pseudo-kidnapping" felony, the elements of which include any movement of the victim incidental to murder.

## B

The statutory offense of first-degree murder[36] requires proof of either premeditation and deliberation or murder while perpetrating (or attempting to perpetrate) any of certain enumerated felonies including kidnapping. *Neither* i) premeditation and deliberation nor ii) perpetration or attempted perpetration of an enumerated felony need be proven, however, if any movement incidental to murder henceforth constitutes kidnapping.

Defining kidnapping, as does the Court, to include any "movement incidental to a crime involving murder" means that the language defining first-degree murder has been revised to state that "[m]urder . . . which is committed in the perpetration, or attempt to perpetrate [wilful, malicious, and forcible movement incidental to a crime involving murder] is murder of the first degree . . . ." Under the construction of the Court, *any* murder where there is any incidental movement of the victim is first-degree murder although there is no evidence of premeditation and deliberation or perpetration or attempted perpetration of a

---

[36] "Murder which is perpetrated by means of poison, lying in wait, or other wilful, deliberate, and premeditated killing, or which is committed in the perpetration, or attempt to perpetrate arson, criminal sexual conduct in the first or third degree, robbery, breaking and entering of a dwelling, larceny of any kind, extortion, or kidnapping, is murder of the first degree, and shall be punished by imprisonment for life." MCL 750.316; MSA 28.548.

statutorily enumerated felony or of a kidnapping involving either secret confinement or forcible confinement not incidental to the murder.

The felony-murder clause aggravates the penalties for unpremeditated or undeliberated murders to first-degree murder.[37] In adding kidnapping as an enumerated felony, the Legislature did not intend to dispense with the need to prove premeditation and deliberation whenever there is an incidental, forcible movement of the victim.

By providing that a murder committed in the perpetration or attempted perpetration of a rape or robbery is first-degree murder, the Legislature created a disincentive for felons who, as an afterthought to rape or robbery, consider murdering their victims. The addition of kidnapping as an enumerated felony was designed to deter and punish the kidnapper who, following a seizure for ransom or the taking of a hostage, considers murdering the victim.

Subjecting a second-degree murderer who incidentally moves the victim to punishment for first-degree murder aggravates the degree of the offense where there is no additional culpability and, hence, no need to provide a disincentive to commission of an aggravated offense.

Subjecting a third-degree criminal sex offender who incidentally moves the victim to punishment for first-degree criminal sexual conduct—permitting the people to charge almost every rape as first-degree criminal sexual conduct—may impair the disincentive to the commission of other aggravating conduct such as "personal injury" to the victim.[38]

_____

[37] *People v Aaron,* 409 Mich 672, 730; 299 NW2d 304 (1980).

[38] See MCL 750.520b(1)(f); MSA 28.788(2)(1)(f).

IV

The issues of statutory construction involved in these cases do not concern "law enforcement" in the sense of the apprehension and successful prosecution of offenders. The question is whether the language of the kidnapping statute will be redefined—after kidnapping was added as an enumerated felony, aggravating second-degree murder to first-degree murder and third-degree criminal sexual conduct to first-degree criminal sexual conduct —so that almost every murder and rape may, because some forcible detention or movement generally is involved in the commission of those offenses, be charged in the first degree.

To so redefine the offense of kidnapping will facilitate prosecution and conviction by extracting guilty pleas[39] to second-degree murder and third-degree criminal sexual conduct. It is not appropriate to so pressure persons charged with murder or rape to plead guilty where the evidence shows that any movement of the victim was incidental to the commission of another physically assaultive offense. Such a redefinition of the offense of kidnapping is, to say the very least, contrary to the principle of lenity in the construction of criminal statutes[40] and frustrates the legislative purpose in grading the offenses of murder and criminal sexual conduct.

V

In *Wesley,* it appears that the victim was seized and moved with the felonious intent to rape or otherwise assault. The movement was incidental to

[39] See generally Alschuler, *The prosecutor's role in plea bargaining,* 36 U Chi L R 50, 85-105 (1968).

[40] *Bell v United States,* 349 US 81, 83; 75 S Ct 620; 99 L Ed 905 (1955).

the bodily assault. The kidnapping conviction was therefore improper. Because kidnapping served as the underlying felony for the first-degree murder conviction, that conviction should be reduced to second-degree murder.

In *Taormina, Gerald Phillips,* and *Phillip Phillips,* the defendants were acquitted of conspiracy to commit murder. It was not contended that the restraint and movement of the undercover officer was for any purpose *other* than murder or assault. The defendants' kidnapping convictions therefore should be vacated.

In *Threet* and *Dopp,* the defendants were convicted of assault with intent to commit murder. There was no evidence that the restraint and movement of the undercover officer was for some other purpose. The Court of Appeals therefore properly reversed the kidnapping convictions.

CAVANAGH, J., concurred with LEVIN, J.

## APPENDIX

Because the language of the kidnapping statute is "not a model of clarity,"[1] it is useful to consider the circumstances that informed the Legislature's enactment of that language.[2] Those circumstances

[1] *People v Adams,* 389 Mich 222, 229; 205 NW2d 415; 59 ALR3d 1288 (1973).

[2] As Lord Blackburn stated:

"In all cases the object is to see what is the intention expressed by the words used. But, from the imperfection of language, it is impossible to know what that intention is without inquiring farther, and seeing what the circumstances were with reference to which the words were used, and what was the object, appearing from those circumstances, which the person using them had in view; for the meaning of the word varies according to the circumstances with respect to which they were used."

*River Wear Comm'rs v Adamson,* 2 App Cas 743, 763 (1877). See also *Church of the Holy Trinity v United States,* 143 US 457, 459; 12 S Ct 511; 36 L Ed 226 (1892):

include the common law, the status and history of
the offense at the time of enactment and amend-
ment, and the relation of the kidnapping statute
to other sections of the Penal Code.

The statutory definition of kidnapping is broader
than the common-law definition of the offense. At
common law, kidnapping was defined as the forci-
ble abduction or stealing away of a man, woman,
or child from his or her own country and sending
them into another.[3] It was considered the most
aggravated species of false imprisonment and, al-
though only a misdemeanor punishable by fine,
imprisonment, and pillory, was "an offence of pri-
mary magnitude."[4]

Common-law kidnapping was a relatively un-
known, seldom committed and inconsequential of-
fense.[5] This was true until the beginning of the
twentieth century, as appears upon perusal of the
Century Edition of the American Digest, covering
the years 1658 to 1896.[6] Less than six pages are
devoted to the reported cases of kidnapping during
this period.[7]

"It is a familiar rule, that a thing may be within the letter of the
statute and yet not within the statute, because not within its spirit,
nor within the intention of its makers. This has been often asserted,
and the reports are full of cases illustrating its application. This is
not the substitution of the will of the judge for that of the legislator,
for frequently words of general meaning are used in a statute, words
broad enough to include an act in question, and yet a consideration of
the whole legislation, or of the circumstances surrounding its enact-
ment, or of the absurd results which follow from giving such broad
meaning to the words, makes it unreasonable to believe that the
legislator intended to include the particular act."

[3] 4 Blackstone's Commentaries 219.

[4] 1 East's Pleas of the Crown 430.

[5] Note, *A rationale of the law of kidnapping,* 53 Colum L R 540
(1953); ALI, Model Penal Code (1980 Official Draft and Revised
Comments), § 212.1, Comment 1, p 210.

[6] The title page advertises the work as "[a] complete digest of all
reported American cases from the earliest times to 1896." 31 Century
Edition Am Digest.

[7] *Id.,* pp 1979-1990. (Each column is paginated, thus resulting in two

A review of the squibs contained in the kidnapping section of the digest indicates that, of forty-two cases cited, twenty involved child stealing plus either an asportation out of the state or country, a concealment or a custody fight; thirteen involved the confinement of a person plus an asportation out of the country, state, or county, or into a different part of the county, or from a residence; three involved claims of unlawful arrest by law enforcement authorities; two involved the transportation of slaves; one involved the transportation of a female out of the country for purposes of prostitution; one involved transportation of a female incidental to consensual sexual intercourse; one involved the consensual transportation of a female child for the purpose of marriage; and one involved confinement under a claim of insanity. The digest cites no cases, either in the kidnapping section[8] or in the homicide section,[9] involving a charge of murder *and* kidnapping.

## Territorial Laws

The definition of the offense of kidnapping under the laws of Michigan has been changed several times. The following provision, contained in the Cass Code of 1816, was enacted by the Governor and Judges of the Territory of Michigan:

"Section 45. And be it Enacted, by the authority aforesaid, That if any person shall kidnap, or steal, or forcibly take away any man, woman or child, bond or free, and send or carry, or with intent to send or carry

page numbers for each actual page.) During the same period, by way of comparison, the digest devoted 589 pages to homicide (vol 26, pp 1-1177), 68 pages to rape (vol 42, pp 1-136), and 24 pages to robbery (vol 42, pp 2691-2737).

[8] 31 Century Edition Am Digest, Kidnapping, §§ 1-12.

[9] 26 Century Edition Am Digest, Homicide, §§ 24-251.

such man, woman, or child, from this Territory, into another Territory, State, or Country: Or shall spirit, persuade, or entice any child, within the age of fourteen years, to leave his father, mother, or guardian, or other person or persons, entrusted with the care of such child and the same child shall secret & conceal, then the person so offending, in any of the premises, and his or her procurers shall be adjudged to be guilty of a high misdemeanor, and on conviction, shall be punished by fine, not exceeding one thousand dollars, or imprisonment at hard labour, not exceeding five years, or both: But neither this act, nor anything therein contained, shall extend to oppose, obstruct, or prevent any master or mistress, who may remove from this Territory, to another State or Territory of the United States, from taking with him or her, his or her servants." 1 Laws of the Territory of Michigan, p 127.

The territorial provision retained the common-law definition of kidnapping with its requirement of asportation out of the territory. In addition, however, the territorial kidnapping provision apparently proscribed conduct that might be described as "inchoate common-law kidnapping," or forcible seizure *with intent* to transport out of the territory.[10]

---

[10] The expansion of the kidnapping definition to include an inchoate version of the common-law offense may have been motivated by a recognition of the inadequacies of the law of attempt. See Model Penal Code, fn 5 *supra,* p 213. Under the territorial provision, kidnapping was a high misdemeanor punishable by a maximum fine of $1,000 or by a maximum of five years at hard labor, or both. The same code apparently contained no general provision covering criminal attempts. It did provide that all common-law offenses not otherwise proscribed in the code, which presumably would include criminal attempts (see Perkins & Boyce, Criminal Law [3d ed], p 611), would be deemed misdemeanors punishable by a maximum fine of $1,000 or by a maximum of one year of solitary hard labor, or both. 1 Laws of the Territory of Michigan, § 58, pp 132-133. Thus, by expanding the definition of kidnapping, one who abducted a person with the intent to transport such person out of the territory, but who failed to complete the common-law asportation requirement, could receive a maximum of five years at hard labor (via a conviction under the kidnapping statute) instead of a maximum of one year at solitary hard labor (via a conviction under the attempt statute).

The Cass Code defined offenses against the person other than kidnapping, including murder (punished by death), rape (15 years), robbery (15 years), and assault with intent to rob (10 years).[11]

## Revised Statutes of 1838

By 1838, after statehood, the Legislature broadened the definition of kidnapping once more:

"Every person who, without lawful authority, shall forcibly or secretly confine or imprison any other person, within this state, against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize and confine, or shall inveigle or kidnap any other person, with intent either to cause such person to be secretly confined or imprisoned in this state, against his will, or to cause such person to be sent out of this state against his will, or to be sold as a slave, or in any way held to service against his will; and every person who shall sell, or in any manner transfer for any term the service or labor of any negro, mulatto, or other person of color, who shall have been unlawfully seized, taken, inveigled or kidnapped from this state, to any other state, place or country, shall be punished by imprisonment in the state prison not more than ten years, or by fine not exceeding one thousand dollars, or both, at the discretion of the court." RS 1838, part 4, title I, ch 3, § 17.

The foregoing textual structure remains in the current kidnapping statute. The definition of the offense was broadened to include the forcible or secret confinement (or imprisonment) within the state of any person, accomplished against the victim's will and without lawful authority. A corresponding change in the intent section included any seizure (or equivalent conduct) with intent to secretly confine or imprison the victim in the state.

[11] 1 Laws of the Territory of Michigan, §§ 1 (p 109), 5 (p 109), 27 (p 118), 28 (p 118).

The addition of secret confinement was consistent with the original purpose in proscribing kidnapping. That purpose was to secure the personal liberty of citizens by providing to them the assistance of the law necessary to release them from unlawful restraint and to deter the very isolation of victims that might invite further criminal conduct.[12] Of course, asportation out of the jurisdiction is not the only means by which isolation of a victim may occur; indeed, an effective isolation need not involve any asportation whatsoever. *Secret* confinement prevents the victim from obtaining friendly assistance in the same way that a common-law asportation out of the country prevented such assistance.

The second change found in the 1838 revision is the addition of language regarding slavery or involuntary service. This language was included both in a separate substantive clause and as an additional intent category in the inchoate section. The slavery language is no longer included in the current statute, although the current inchoate section retains an involuntary service clause.

The third change found in the 1838 revision is the deletion of the special clause concerning the kidnapping of children. A separate statutory provision concerning this topic reappeared in the revision of 1846.[13]

Finally, the Legislature changed the maximum punishment for kidnapping from five years at hard labor plus a $1,000 fine to ten years imprisonment plus a $1,000 fine. This maximum sentence, however, remained significantly less than the punishments fixed for first-degree murder (death), second-degree murder, armed robbery with intent to kill

[12] *Smith v State,* 63 Wis 458; 23 NW 879, 882 (1885). See Model Penal Code, fn 5 *supra,* Comment 1, p 211, Comment 2, p 222.

[13] RS 1846, ch 153, § 30.

if resisted, and rape (all life sentence offenses), and assault with intent to murder, attempted murder by means not constituting an assault, armed assault with intent to kill, and assault with attempt to rape (20-year offenses).[14]

### *Revised Statutes of 1846*

In the 1846 revision, the basic structure of the kidnapping provision remained the same:

"Every person who, wilfully and without lawful authority, shall forcibly or secretly confine or imprison any other person within this state, against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize and confine, or shall inveigle or kidnap any other person with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or to cause such person to be sent out of the state against his will, or to be sold as a slave, or in any way held to serve against his will; and every person who shall sell, or in any manner transfer for any term, the service or labor of any negro, mulatto, or other person of color, who shall have been unlawfully seized, taken, inveigled or kidnapped from this state, to any other state, place, or country, shall be punished by imprisonment in the state prison not more than ten years, or by fine not exceeding one thousand dollars." RS 1846, ch 153, § 25; CL 1857, 5735.

The first part of the provision was amended to read: "Every person who, *wilfully and* without lawful authority . . . ." This amendment is significant in that it adds a special mental element to the offense of kidnapping. Thus, to constitute kidnapping, the conduct proscribed by the statute must be more than merely voluntary; especially when "wilfully" is used in conjunction with "mali-

---

[14] RS 1838, part 4, title I, ch 3, §§ 1, 8-14, 15-16.

ciously[15] and without lawful authority," there must be an actual intent or purpose to cause the particular harm involved in the crime, without any circumstance of justification, excuse, or mitigation.[16]

Also in the 1846 revision the maximum punishment for first-degree murder was changed to life imprisonment.[17] The maximum punishments for assault with intent to murder and attempted murder by means not constituting assault were increased to imprisonment for life or any term of years.[18] The maximum punishments for armed assault with intent to rob and assault with intent to commit rape were reduced to 15 years and 10 years imprisonment, respectively.[19]

## Compiled Laws of 1871

In 1859, the Legislature amended as follows the text of the kidnapping provision:

"Every person who willfully, and without lawful authority, shall forcibly or secretly confine or imprison any other person within this State against his will, or shall forcibly carry or send such person out of this State, or shall forcibly seize and confine, or shall inveigle or kidnap any other person, with intent either to cause such person to be secretly confined or imprisoned in this State against his will, or to be sold as a slave, or in any way held to serve against his will, and every person who shall sell, or in any manner transfer for any time, the service or labor of any negro, mulatto, or other person of color, who shall have been unlawfully

[15] The word "maliciously" was added to the kidnapping provision in 1889 PA 135.

[16] See Perkins & Boyce, Criminal Law (3d ed), pp 838-840, 856-861, 875-879.

[17] RS 1846, ch 153, § 1.

[18] *Id.,* §§ 13, 14.

[19] *Id.,* §§ 16, 21.

seized, taken, inveigled or kidnapped from this State, to any other State, place or country, or who shall bring any negro, mulatto, or other person of color, into the State, claiming him or her as a slave, shall be punished by imprisonment in the State Prison not more than ten years, or by fine not exceeding one thousand dollars." 1859 PA 189; CL 1871, 7534.

There were two changes made by this amendment. First, the clause regarding intent to cause the victim to be sent out of the state was deleted. Second, the slavery section was broadened so that a person bringing a slave into the state would be guilty of kidnapping.

### Howell's General Statutes (1882)

In 1875, the statute was amended to read:

"Every person who willfully and without lawful authority shall forcibly or secretly confine or imprison any other person within this State against his will, or shall forcibly carry or send such person out of this State, or shall forcibly seize and confine, or shall inveigle or kidnap any other person with intent either to cause such person to be secretly confined or imprisoned in this State against his will, or in any way held to service against his will, shall be punished by imprisonment in the State prison not more than ten years, or by fine not exceeding one thousand dollars." 1875 PA 191; How Stat 9099.[20]

The slavery provisions were made unnecessary as the result of the ratification of the Thirteenth

[20] It should be noted that the Howell version differed in one respect from the 1875 official version. The inchoate section of the 1875 version begins with: "or shall forcibly seize and confine," whereas the Howell version begins with: "or shall forcibly seize *or* confine" (emphasis added). The latter version remains in the current statute.

Amendment. Nevertheless, the involuntary servitude clause was retained in the intent section.

## Compiled Laws of 1897

The 1889 amendment of the statute was significant in that it increased the maximum punishment for kidnapping:

"Every person who willfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this State against his will, or shall forcibly carry or send such person out of this State, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent either to cause such person to be secretly confined or imprisoned in this State against his will, or in any way held to service against his will, shall be punished by imprisonment in the State prison for any term of years, or by a fine of five thousand dollars, or by both such fine and imprisonment, in the discretion of the court." 1889 PA 135; CL 1897, 11494.

Instead of ten years or a $1,000 fine, the Legislature provided for imprisonment for any term of years, or a $5,000 fine, or both. In addition, the 1889 amendment added the word "maliciously" to the first clause of the statute.

## 1931 Penal Code

In the twentieth century, professional criminals associated with "organized crime" kidnapped persons to enforce their own "laws." It was then only a short progression to the kidnapping of persons for purposes of extortion. This offense increased during the 1920's and early 1930's. Public concern

was very high, and the "last straw" was the Lindbergh kidnapping in March, 1932.[21]

Public clamor led most states to revise their kidnapping statutes. Since maximum penalties were, for the most part, increased greatly, the most common legislative action was a grading scheme to distinguish among the more serious offenses of aggravated kidnapping and the less serious offenses, such as false imprisonment or felonious restraint.[22]

In Michigan, the legislative response was different. A 1931 revision of the Penal Code retained the previous structure of the kidnapping provision:

"Any person who wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years." 1931 PA 328.

The intent section was amended to include the intent "to extort money or other valuable thing." Also, the maximum punishment was increased to life imprisonment while the possibility of imposing a monetary fine was eliminated. However, there was no grading of the different restraint offenses, thus leaving open the possibility that relatively trivial or incidental instances of restraint could be

---

[21] See Note, fn 5 *supra,* p 540. The Lindbergh kidnapping led Congress to enact a federal kidnapping statute. Act of June 22, 1932, ch 271, § 1, 47 Stat 326. The current federal kidnapping provision is reprinted at 18 USC 1201.

[22] See Model Penal Code, fn 5 *supra,* Comment 1, pp 216-217.

punished as severely as the most aggravated examples of kidnapping.

The kidnapping statute has not been amended since 1931. It is apparent that the Legislature of that era was concerned with the growing problem of abduction for purposes of ransom. However, the structure and most of the language of the kidnapping statute has remained intact since 1838. Since we are dealing with statutory language rather than a common-law doctrine, we may not alter the meaning of the language beyond that contemplated by the Legislature.

Even very broad statutory language must be construed in light of the history surrounding its enactment. As observed by the United States Supreme Court when construing the federal kidnapping act in *Chatwin v United States,* 326 US 455, 464; 66 S Ct 233; 90 L Ed 198 (1946):

"[T]he broadness of the statutory language does not permit us to tear the words out of their context . . . .

"Were we to sanction a careless concept of the crime of kidnapping or were we to disregard the background and setting of the Act the boundaries of potential liability would be lost in infinity."

CAVANAGH, J., concurred with LEVIN, J.

KAVANAGH, J. These cases were submitted on consolidated appeals because they raise common questions about Michigan's kidnapping statute.

We would hold that the statute defines several specific intent crimes. The various offenses consist of particular acts which are calculated to accomplish certain purposes. Commission of the act without one of these purposes is insufficient to put the actor in violation of the kidnapping statute.

I

The first paragraph of the kidnapping statute, which defines the substantive offenses, reads:

"Any person who wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years." MCL 750.349; MSA 28.581.

The statute describes a series of acts followed by several purposes. The structure of the statute leaves unclear, at first glance, whether the purposes limit all or only some of the acts and, if only some, which and why.

This ambiguity in the statute's structure was adverted to, but left unresolved, in *People v Otis Adams,* 34 Mich App 546; 192 NW2d 19 (1971), which was the first case to give extensive treatment to the statute. The *Otis Adams* Court said:

"The second part of the statutory definition may be viewed as a qualification of the first part and, if so, then it would be necessary to consider in every case where kidnapping is charged whether a seizure or confinement was with the proscribed specific intent. Or the second part may be viewed as independent of the first part. The form of the information filed in this case and our disposition of this appeal makes it unnecessary for us to consider these further questions." *Otis Adams,* p 550, fn 1.

The information in *Otis Adams* charged the defendant with "wilfully, maliciously, and without lawful authority forcibly confining and imprisoning another person, to-wit: Inspector Joseph Dembosky, within this state and against his will." The

information borrowed words from the statute although it omitted any element of intent, as the Court noted.

On the premise that the information charged an offense within the statute, the Court concluded that the statute suffered from the constitutional infirmity of being so vague that it "confers upon judges or jurors an unlimited discretion to determine who shall be punished for certain conduct." *Otis Adams,* p 559. "It is obvious that virtually any assault, any battery, any rape, or any robbery involves some 'intentional confinement' of the person of the victim. To read the kidnapping statute literally is to convert a misdemeanor, for example, assault and battery, into a capital offense." *Otis Adams,* p 560. The Court felt duty-bound "to preserve the essence of the statute while construing it to withstand constitutional challenge." *Otis Adams,* p 561. This it did by requiring that there must be shown an asportation of the victim having significance independent of the assault. This approach paralleled that of other state courts. With some modification, the analysis of the Court of Appeals was accepted by this Court in the same case, where we said that the asportation must not be "merely incidental to the commission of a lesser underlying crime, *i.e.,* it must be incidental to the commission of the kidnapping." *People v Adams,* 389 Mich 222, 236; 205 NW2d 415; 59 ALR3d 1288 (1973). This rule of *Adams* was extended by *People v Barker,* 411 Mich 291, 301; 307 NW2d 61 (1981), to apply "regardless of the length of punishment mandated by the Legislature."

The concept of asportation having significance independent of the assault helped to give reason and life to this statute, but in order to make this statute truly effective it is necessary to apply the "intent" provisions to all parts of the legislation.

This statute prohibits specified conduct by a person having a specified intent. In essence, the conduct specifically prohibited is the forcible or secret confinement of a person within this state or the forcible transportation of such person outside the state.

Such conduct violates this statute when it is performed by a person with any of the following specified intents:

1. The intent to extort money or other valuable thing;

2. The intent to confine a person within the state;

3. The intent to hold a person in involuntary service.

The confinement or holding of a person to involuntary service must be the ultimate purpose behind the course of conduct, rather than an incident of some other offense, such as robbery or rape, which may involve some confinement for completion.

It is the intent language of the statute that defines the offense, thereby distinguishing it. The similarity of the physical acts described in the statute (forcible and secret confinements and seizures) to ordinary assaultive offenses and the constitutional difficulties of distinguishing one from the other for the purpose of applying the kidnapping statute have already been discussed. Such problems disappear if effect is given to the purposes part of the statute as a qualification of the first part, as suggested in footnote 1 in *Otis Adams, supra.* Where the defendant commits one of the various forms of assault described in the statute and he has done so for the purpose of extorting something of value or for the purpose merely of secretly confining the victim, he has committed a kidnapping. But if he assaults another for the

purpose of robbery or rape, he has not committed a kidnapping; rather, he has violated other criminal statutes designed to punish that conduct.[1] The kidnapping statute does not list robbery or rape among the intents proscribed. As with other specific intent crimes, the defendant's intent controls.

This interpretation of the statute reasonably gives harmonious reading to all of the words in the statute. Were the stated purposes held not to modify every preceding clause, there would be no reasoned way of determining to which clauses they are applicable. There is no reason to give the statute an interpretation that would punish conduct already proscribed by other statutes. We are convinced that when the Legislature enacted this statute, it intended to punish conduct that had not elsewhere been proscribed.

Interpreting the statute in this manner is preferable to a reading which finds it unconstitutionally overbroad. Moreover, criminal statutes are strictly construed to prohibit a narrow range of conduct. Because there is a question whether this statute was intended by the Legislature to cover a broad class of acts (general intent) or a narrow class of acts (specific intent), we are constrained by the rubric of strict construction to read it only as covering the latter.

"[S]ince the power to declare what conduct is subject to penal sanctions is legislative rather than judicial, it would risk judicial usurpation of the legislative function

---

[1] Kidnapping must be proven independently of any other crime. Thus, confinement for the purpose of rape is not kidnapping, but rape. If there is proof of a confinement calculated to accomplish one of the ultimate purposes stated in the statute, kidnapping may be established. Other offenses, for which conviction may be had, may be committed in the course of a kidnapping. Such is the case, for example, if a person kidnapped for ransom is raped or killed. Those offenses, however, are collateral to the kidnapping and do not supply proof of any of the elements of kidnapping.

for a court to enforce a penalty where the legislature had not clearly and unequivocally prescribed it. Thus a court has stated that the reason for the rule was 'to guard against the creation, by judicial construction, of criminal offenses not within the contemplation of the legislature.' Further along the same line, it has been asserted that since the state makes the laws, they should be most strongly construed against it." 3 Sands, Sutherland Statutory Construction (4th ed), § 59.03, p 8.

If it be said that this construction fails to address all of the imaginative contemporary forms of kidnapping, it must be remembered that our kidnapping statute is little different from the one adopted in 1875, the time of its last significant amendment. We should construe the statute as we find it. It is not the Court's role to stretch the statute to situations not originally intended to be covered.

Inasmuch as we have not heretofore required this proof of intent, we would make this holding prospective and would only apply it to the cases before us and those cases tried after the date of this opinion and to cases tried before the date of this opinion in which the issue of proof of defendant's intent to accomplish one of the proscribed purposes was preserved on appeal.

## II

### *People v Wesley*

The defendant was convicted of kidnapping, MCL 750.349; MSA 28.581, and first-degree murder, MCL 750.316; MSA 28.548, because of a death which occurred in the course of a kidnapping, one of the enumerated felonies in the first-degree murder statute. The defendant was sentenced to the mandatory term of life imprisonment for first-degree murder. No sentence was imposed for the

kidnapping conviction. The Court of Appeals affirmed, but remanded for vacation of the kidnapping conviction because it was a necessary element of the murder. See *People v Wilder,* 411 Mich 328; 308 NW2d 112 (1981). *People v Wesley,* 103 Mich App 240; 303 NW2d 194 (1981). We granted leave to appeal, *People v Wesley,* 414 Mich 864 (1982). According to the testimony presented at trial, the defendant and a companion walked out of a bar in Flint as two women were leaving the bar's parking lot in their car. The defendant's friend suddenly leaped through an open window on the passenger side of the car. The defendant went over to the car and opened the passenger door, and one of the women leaped out and ran for the bar. With one woman left in the car, defendant got in the back seat as his friend drove the car five or six blocks and parked.

The woman and defendant's friend began struggling in the front seat. The friend threw the woman into the back seat and then he followed. Defendant testified that he grabbed the woman and pushed his friend back, telling him "we don't have to do this." Next, according to the defendant, the woman bit his arm and pulled a gun from her purse. While he tried to wrest the gun from her, defendant said, it discharged. He and his friend then fled. The police found the woman dead in the back seat of the car. Neighbors, who had heard the woman's cries for help during the 15- to 20-minute duration of the episode, said they called the police four times.

The defendant testified that he believed his friend intended to rape the woman. A cousin of the defendant testified that the defendant told him "they was in the car with the lady and they was trying to rape the lady and the lady put up a fight." The cousin recalled that the defendant told

him that the woman had bitten him, "[a]nd he said the lady wouldn't let go of his arm so he had to shoot her."

The trial judge instructed the jury on kidnapping as follows:

"For the crime of kidnapping the prosecutor must prove each of the following elements beyond a reasonable doubt: any person who shall wrongfully, intentionally and forcibly confine another person against her will and move her from one place to another or cause her to be moved from one place to another is guilty of the crime of kidnapping. Mr. Wesley pled not guilty to that charge.

"And to establish the charge of kidnapping, the prosecutor must prove each of the following elements beyond a reasonable doubt: first, the victim, Carol Agee, must have been forcibly confined or imprisoned. Second, that such must have been done against her will and without lawful authority. Third, that during the course of such confinement the defendant must have forcibly moved or caused the victim to be moved from one place to another for the purpose of abduction and kidnapping. Such movement is not sufficient if it's part of a crime other than kidnapping. In this case, for instance, you should consider whether the movement was for the purpose of kidnapping or whether it was a part of the crime of murder.

"In determining whether or not the movement was for the purpose of kidnapping, you may consider whether the movement was for a few feet or for a substantial distance and whether it added any greater danger or threat to the victim than the crime of murder. If the underlying crime involves murder, movement incidental to that is generally sufficient to establish a valid statutory kidnapping. However, the evidence must convince you beyond a reasonable doubt that there was movement independent of the other crime and that it was for the purpose of kidnapping.

"Fourth, at the time of such confinement the defendant must have intended to kidnap the victim. And fifth, that at the time of such confinement the defendant must have been acting wilfully and maliciously.

"Wilful and malicious means that the defendant intentionally confined the victim knowing such confinement to be wrong and that it was done without legal justification or excuse."

The court's reinstructions on kidnapping were substantially the same.

Defendant argues that the trial court erred in instructing the jury that movement incidental to a murder is generally sufficient to establish kidnapping under the statute. Although the court correctly instructed that the element of movement is insufficient if part of any other offense, these instructions conflicted and a presumption arises that the jury followed the erroneous one.

The people respond that the instruction on movement incidental to murder was correct because it falls within an exception to *Barker* set out in *Adams.* "If the underlying crime involves murder, extortion or taking a hostage, movement incidental thereto is generally sufficient to establish a valid statutory kidnapping." *Adams,* p 238. In any event, the people contend, the underlying offense was neither "lesser," *Adams,* nor "co-equal," *Barker,* because first-degree murder calls for imprisonment for life, and kidnapping for life or any term of years.

These jury instructions fail to convey all that is required to find defendant guilty of kidnapping. The jury was not instructed that the defendant, in order to be guilty of kidnapping, must have acted with the specific intent to accomplish one of the purposes stated in the statute. The trial court told the jury that the defendant must have "intentionally . . . confine[d] another person against her will" and that "[w]ilful and malicious means that the defendant intentionally confined the victim knowing such confinement to be wrong." These

instructions only address the element of a wilful act. They fall short of explaining that the defendant must have so acted with the specific intent to accomplish a certain purpose.

The instruction that "the defendant must have intended to kidnap the victim" merely states the conclusion; an "intent to kidnap" means, under the statute, an intent to extort money or other valuable thing, an intent to cause a person to be secretly confined or imprisoned in this state against his will or an intent to hold a person to service against his will. What evidence of purpose appears in this record tends to show criminal sexual conduct. If the intent behind the course of conduct is criminal sexual conduct, that will not support a conviction of kidnapping because criminal sexual conduct is not included among the purposes proscribed by the statute.

We cannot accept the people's contention that the first-degree murder conviction may be sustained in spite of the error infecting the defendant's kidnapping conviction which would require reversal merely because the latter was quashed by the trial court. Inasmuch as kidnapping was the enumerated felony which elevated second-degree murder to first-degree, reversal of the kidnapping conviction removes an element necessary to sustain a conviction of first-degree felony murder.

We would reduce defendant's conviction to second-degree murder, MCL 750.317; MSA 28.549, and remand for resentencing, but give the prosecutor the option of again trying defendant for felony murder. We are not persuaded that the Court of Appeals erred in the other respects asserted by defendant.

### III

*People v Taormina*

*People v Gerald Phillips and Phillip Phillips*

The defendants were tried together and charged with conspiracy to murder, MCL 750.157a, 750.316; MSA 28.354(1), 28.548, and kidnapping, MCL 750.349; MSA 28.581. A jury acquitted defendants of the conspiracy charges but convicted them of kidnapping. In an unpublished per curiam opinion decided on April 30, 1981, defendant Taormina's conviction was affirmed by the Court of Appeals. In a separate opinion, defendants Phillips' convictions were affirmed by the appellate court. *People v Phillips,* 112 Mich App 98; 315 NW2d 868 (1982). We granted leave to appeal. *People v Phillips,* 414 Mich 866 (1982), *People v Taormina,* 414 Mich 865 (1982).

On October 19, 1976, Michigan State Police Trooper James Grinwis met an informant named John T. The two agreed to work together as an undercover team. On October 20, John T. told Grinwis that James Atherton, a codefendant in these cases who is not involved in these appeals, would sell cocaine. John T. and Grinwis went to a store in the City of Wyoming where they met Atherton. From there, the three men went to a restaurant where Grinwis gave Atherton his phone number and the initials J. P. as his name. Grinwis, who had been equipped with an electronic monitoring device, then drove John T. to Detroit and was never in contact with him again.

At 4:45 a.m. on October 25, two men armed with a shotgun entered defendant Taormina's home in Sterling Heights. They took cash and jewelry. Defendant Taormina recognized one of the men as John T., whom he heard address his partner as

J. P. Subsequently, defendant Taormina learned that John T. had been in Grand Rapids with a man named J. P. trying to buy drugs from codefendant Atherton.

Around October 28, Taormina and Gerald and Phillip Phillips traveled to Atherton's home in Ottawa County. Taormina hoped that Atherton could help him locate John T., J. P., and the stolen property.

At 3:40 a.m. on October 29, trooper Grinwis received a phone call from Atherton, who said his people were in town to do business right away. Grinwis refused to meet at that hour. He told that to Atherton in the first phone call and again at 3:55 a.m. and at 4:10 a.m. when Atherton phoned back. Atherton called again at 10:15 a.m. and this time trooper Grinwis agreed to meet him at a restaurant 45 minutes later.

Trooper Grinwis then secured $600 in police funds. He was equipped with an electronic monitoring device and a surveillance team was assembled. Grinwis met Atherton at the restaurant. Also there was Gerald Phillips, who was introduced as Tim. After discussing drugs, Atherton drove home for a sample. Grinwis and Phillips decided to meet Atherton and drove in that direction. When he arrived at Atherton's home with Gerald Phillips, Grinwis encountered Atherton, Taormina, and Phillip Phillips. Gerald Phillips pointed a gun at Grinwis and asked where John T. was. Taormina identified J. P. as one of the men who robbed him. Then Atherton told Phillips not to shoot Grinwis there because there were too many people around.

Grinwis was then placed in the back seat of a black car with Gerald Phillips, holding a gun, sitting next to him. Phillip Phillips sat in the front seat with Taormina in the driver's seat. There were more questions about John T. Gerald Phillips

said, "let's just go and get it over with." With Taormina driving, the car approached road M-45, and the surveillance police drove in front of it. All four defendants were arrested.

Gerald and Phillip Phillips contend that the jury instructions on asportation were deficient under *Barker, supra*. They also argue that the trial court failed to charge the jury that it must find a secret confinement, as alleged in the information, before it could convict of kidnapping.

Taormina contends that the kidnapping statute requires a showing of specific intent to extort money or other valuable thing, or to cause a person to be secretly confined or imprisoned in this state against his will, or to hold a person to service against his will. Defendant argues that the information failed to allege one of these elements, that the trial judge failed to instruct on the elements, and that the people produced no proof of one of the elements.

We find it necessary to address only the claim of error relating to the jury instructions. The court instructed the jury that

"[t]he elements or instructions with regard to kidnapping are as follows: any person who shall wrongfully, intentionally, and forcibly confine another person against his will and move him from one place to another or cause him to be moved from one place to another is guilty of this crime. The defendant pleads not guilty to this charge.

"To establish this charge the people must prove each of the following elements beyond a reasonable doubt. First, that the victim, J. P., or also known as James Grinwis, must have been forcibly confined or imprisoned. Second, the victim must have been so confined or imprisoned against his will and without lawful authority. Third, during the course of such confinement the defendant must have forcibly moved or caused the victim to be moved from one place to another for the

purpose of abduction and kidnapping. Such movement is not sufficient if it is part of a crime other than kidnapping.

"In this case, for instance, you should consider whether or not the movement was for the purpose of kidnapping or whether it was a part of the crime of felonious assault.

"I will describe felonious assault to you in a few minutes. In determining whether or not the movement was for the purpose of kidnapping, you may consider whether the movement was for a few feet or whether it was for a substantial distance and whether it added any greater danger or threat to the victim than the crime of felonious assault; however, the evidence must convince you beyond a reasonable doubt that there was a movement independent of the other crime and that it was for the purpose of kidnapping.

"Fourth, that at the time of such confinement the defendant must have intended to kidnap the victim. You will recall the instructions on specific intent which I said applies also to this charge of kidnapping.

"Fifth, at the time of such confinement the defendant must have been acting wilfully and maliciously. Wilfully and maliciously means that the defendant intentionally confined the victim knowing such confinement to be wrong and that he did so without legal justification or excuse.

"In order to find the defendant guilty of kidnapping you must be convinced beyond a reasonable doubt that the defendant acted without legal justification or excuse. The kind of excuse which could negate the defendant's guilt is an excuse recognized by the law."

The people argue that the trial court gave extensive instructions on specific intent.

We find that these instructions were erroneous for failing to explain the element of specific intent and that reversal is required. As the people point out, the trial judge instructed that the defendants must have intended to kidnap. This statement is insufficient by itself, however, to guide the jury's

deliberations. An intent to kidnap is an intent to accomplish one of the purposes prohibited by the statute. One of the statute's proscribed acts must have been committed with the intent to extort money or other valuable thing, to cause a person to be secretly confined or imprisoned in this state against his will, or to hold a person to service against his will. Without instruction on one of these prohibited purposes, the jury is not adequately informed of what is meant by an intent to kidnap.

This instructional error requires that defendants' convictions of kidnapping should be reversed and the case be remanded for a new trial.

Because the other points assigned as error are unlikely to recur on remand, we do not address them.

IV

*People v Threet*

*People v Dopp*

Defendants James Threet and Keith Darwin Dopp were convicted in a single jury trial of kidnapping, MCL 750.349; MSA 28.581, assault with intent to commit murder, MCL 750.83; MSA 28.278, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). In an unpublished per curiam opinion decided on March 24, 1982, the Court of Appeals reversed both kidnapping convictions and Dopp's felony-firearm conviction and affirmed the other convictions. We granted the people's request for leave to appeal and defendants' request for leave to cross-appeal. 414 Mich 867 (1982).

According to the evidence presented at trial, undercover state police sergeant John T. Korzek attempted to complete a drug sale with defendant

Threet. The two men entered a brown Ford car, which Threet drove. Shortly, Sgt. Korzek, who wore an electronic monitoring device, suggested stopping the car and completing the sale because "I really don't want to go any further." Threet said okay, pulled the car over to the roadside, and pointed a gun at Sgt. Korzek. The defendant then said, according to Sgt. Korzek's testimony:

" 'Tom,' he said, 'Put your hands on the dash.' He said, 'Don't say a word.' He said, 'Are you a cop?' And I said no. He said—well, he said, 'Just don't say a word. Don't move,' he said, 'Or I'll blow you away.' He said, 'I'm going to take you down the road. We're going to pick somebody else up. We're going to trip to a house. We're going to give you a bath. We're going to check you out. If you're a cop or if you're wired or if you aren't who you say you are, you're a dead mother-fucker.' He said, 'But if you're cool,' he said, 'We can make lots of money, you know, and we're in business. But,' he said, 'Don't move.' He said, 'Don't try anything because I'll blow you away.' "

The pair then drove to a bar in Britton where another man, identified as Jerry Woodby, got into the back seat of the car behind Korzek and pointed a shotgun at him. As the car passed a parking lot, Threet sounded the horn. A red car emerged, driven by Dopp, and followed the car driven by Threet. Eventually, the cars came to a railroad crossing where they were stopped by a passing train. Threet decided to switch cars. Dopp approached the front car containing Sgt. Korzek, looked in the driver's side window and told Korzek "you are dead." Woodby then got Korzek out of the car and began walking him back to the red car with a shotgun pointed at him. Sgt. Korzek then tripped Woodby and was able to escape by running away. As he ran, he heard three shots fired.

In reversing the kidnapping convictions, the Court of Appeals held that the jury instructions were erroneous. The appellate court found inadequate an instruction that, in order to convict of kidnapping, defendants "must have forcibly moved the victim or caused him to be moved from one place to another for the purpose of abduction and kidnapping." The trial court should also have explained what movement would be insufficient for the asportation element of kidnapping. In addition, the Court found error in the instruction that the "kidnapping must have been done with the intent to confine or imprison the victim in this state, cause him in some way to be held for service against his will, or to murder the victim." Error was committed, the Court of Appeals held, by allowing the jury to base a conviction on a finding that the abduction was committed to murder the victim and reversal was required.

In this appeal, the people argue that the defendants' conduct constituted kidnapping and that the jury instructions were correct. The people contend that, according to *Adams, supra,* pp 237-238, the trial court correctly instructed that a confinement and carrying away with the intent to murder the victim is kidnapping under the statute. In addition, the people argue that it was sufficient for the trial court to state positively that the asportation which is required must have been committed for the purpose of kidnapping.

We agree with the Court of Appeals that it was error to instruct that a confinement committed with the intent to murder the victim is kidnapping and that reversal is required. The kidnapping statute does not include murder among the intents specified.

The jury might well have returned verdicts of guilty of kidnapping by finding, in accordance with

the instructions, a confinement and asportation coupled with an intent to murder. Because we have determined that such an intent is not included in the kidnapping statute, reversal by the Court of Appeals of both defendants' convictions of kidnapping should be affirmed and the cases remanded for a new trial. An incorrect recital of the law undermines the purpose of jury instructions. An incorrect instruction poses the unacceptable risk of convicting a defendant of a crime unknown to the laws of Michigan. *People v Butler,* 413 Mich 377; 319 NW2d 540 (1982). We believe that the jury may well have convicted these defendants of a fictitious offense.

As to the other assignments of error raised by defendants, as cross-appellants, we are not persuaded that there is error, and we decline to address issues not raised in the Court of Appeals.

CAVANAGH, J., took no part in the decision of *Wesley, Threet,* and *Dopp.*